PAMELA B. *v.* AARON MENT ET AL.
(SC 15719)

Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.[1]

---

[1] Subsequent to oral argument in this appeal, Chief Justice Callahan, a member of the en banc panel that heard the case, recused himself. See General Statutes § 51-207 (a).

Argued September 30, 1997—officially released March 31, 1998

*Gregory T. D'Auria*, assistant attorney general, with whom were *Susan T. Pearlman*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney

general, for the appellants-appellees (named defendant et al.).

*Paul Chill,* supervising attorney, with whom were *Hollace P. Brooks* and *Jon Bauer,* supervising attorneys, and, on the brief, *Michele Camerota,* certified legal intern, for the appellee-appellant (plaintiff).

*Martha Stone, Stephen Wizner* and *David Friedman,* certified legal intern, filed a brief for the Center for Children's Advocacy, Inc., et al., as amici curiae.

*Opinion*

KATZ, J. The plaintiff, Pamela B., brought this action against the defendants, Aaron Ment, in his official capacity as chief court administrator, John Rowland, in his official capacity as governor of the state of Connecticut,[2] and Linda D'Amario Rossi, in her official capacity as commissioner of children and families, seeking a declaratory judgment pursuant to Practice Book § 389 et seq., now Practice Book (1998 Rev.) § 17-54 et seq.,[3] and injunctive relief on behalf of herself and a class of persons consisting of all parents in the state whose children have been or may be seized by the state department of children and families (department), and who have been or may be denied their statutory and constitutional right to challenge the state's temporary custody in a timely evidentiary hearing.[4] The plaintiff

---

[2] The plaintiff withdrew the action against Governor Rowland on March 8, 1996. References herein to the "defendants" are to Ment and Rossi jointly. Individually, they are referred to by name.

[3] Practice Book § 389, now Practice Book (1998 Rev.) § 17-54, provides: "The court will, in cases not herein excepted, render declaratory judgments as to the existence or nonexistence (a) of any right, power, privilege or immunity; or (b) of any fact upon which the existence or nonexistence of such right, power, privilege or immunity does or may depend, whether such right, power, privilege or immunity now exists or will arise in the future."

[4] On March 22, 1996, the plaintiff, pursuant to Practice Book § 90, now Practice Book (1998 Rev.) § 9-10, filed a motion for class certification to certify the present action as a class action and to designate the plaintiff class as all parents in the state whose children have been or may be seized

alleged that on August 8, 1995, the department, assisted by East Hartford police officers, acting pursuant to General Statutes § 17a-101g,[5] and Practice Book § 1041.1,

by the department and who have been or may be denied their statutory and constitutional right to challenge in a timely evidentiary hearing the state's temporary custody. That motion is still pending. Additionally, in her complaint, the plaintiff alleged, inter alia, the following: that the members of the class are so numerous that joinder is impracticable; that the class includes a constantly changing group of parents; that there are questions of law and fact common to the class that predominate over any questions affecting individual members; that the plaintiff's claims are typical of the claims of the class and that the typical claims predominate over any questions affecting only individual members of the class; that the plaintiff will fairly and adequately protect the interests of the class; and that the plaintiff has no interests antagonistic to those of the class.

[5] General Statutes § 17a-101g provides: "Classification and evaluation of reports. Investigation. Home visit. Removal of child in imminent risk of harm. (a) Upon receiving a report of child abuse as provided in section 17a-101b, the Commissioner of Children and Families, or his designee, shall cause the report to be classified and evaluated immediately. If the report contains sufficient information to warrant an investigation, the commissioner shall make his best efforts to commence an investigation of a report concerning an imminent risk of physical harm to a child or other emergency within two hours of receipt of the report and commence all other reports within seventy-two hours of receipt of the report. The department shall complete any such investigation within thirty calendar days of receipt of the report.

"(b) The investigation shall include a home visit at which the child and any siblings are observed, if appropriate, a determination of the nature, extent and cause or causes of the reported abuse or neglect, a determination of the person or persons suspected to be responsible for such abuse or neglect, the name, age and condition of other children residing in the same household and an evaluation of the parents and the home. The report of such investigation shall be in writing. The investigation shall also include, but not be limited to, a review of criminal conviction information concerning the person or persons alleged to be responsible for such abuse or neglect and previous allegations of abuse or neglect relating to the child or other children residing in the household or relating to family violence.

"(c) If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing

now Practice Book (1998 Rev.) §§ 32-6 through 32-9,[6] seized her nineteen month old son, Jonathan B., and placed him on a "ninety-six hour hold." On August 11, 1995, pursuant to General Statutes § 46b-129 (b),[7] the

the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section.

"(d) The removal of a child pursuant to subsection (c) of this section shall not exceed ninety-six hours. During the period of such removal, the commissioner, or his designee, shall provide the child with all necessary care, including medical care, which may include an examination by a physician or mental health professional with or without the consent of the child's parents, guardian or other person responsible for the child's care, provided reasonable attempts have been made to obtain consent of the child's parents or guardian or other person responsible for the care of such child. During the course of a medical examination, a physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. If the child is not returned home within such ninety-six-hour period, with or without protective services, the department shall proceed in accordance with section 46b-129."

[6] Practice Book § 1041.1; see Practice Book (1998 Rev.) §§ 32-6 and 32-7; provides in pertinent part: "Order of Temporary Custody

"(1) Upon proper application therefor, an order of temporary custody may be issued ex parte by the court at the time of the filing of the petition or subsequent thereto. The application must be supported by a sworn statement alleging such facts as would support a finding of probable cause to believe that the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from the surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety.

"If the application is filed subsequent to the filing of the petition, a motion to amend the petition or to modify protective supervision shall be filed no later than the next business date before the hearing on any order to show cause or temporary custody.

"(2) The order of temporary custody shall contain a statement of the respondent's right to counsel and to remain silent, and of the hearing to be held within ten days of the operative date of the order solely on the issue of the continued need for protective custody. . . ."

[7] General Statutes § 46b-129 provides in pertinent part: "Commitment of child or youth. Petition for neglected, uncared-for, dependent child or youth. (a) Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the Superior Court which has venue

department applied, ex parte, to the Superior Court for Juvenile Matters in Hartford, for an order of temporary

over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (e) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the Commissioner of Children and Families of the time and place when the petition is to be heard not less than fourteen days next preceding the hearing in question.

"(b) If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, or by any probation officer appointed in accordance with section 46b-123, investigator from the Department of Administrative Services, state police officer or indifferent person. The expense for any temporary care and custody shall be paid by the town in which such child or youth is at the time residing, and such town shall be reimbursed therefor by the town found liable for his support, except that where a state agency has filed a petition pursuant to the provisions of subsection (a) of this section, the agency shall pay such expense. If the court, pursuant to this subsection, vests in a suitable agency or person the child's or youth's temporary care or custody, the court shall provide to the commissioner and the parent of the child or youth specific steps which the parent may take to facilitate the return of the child or youth to the custody of such parent. If the court, after a show cause hearing pursuant to this section, maintains the custody of the child or youth in the parent, the court may provide to the commissioner and the parent specific steps which the parent may take to maintain custody of the child or youth. . . ."

custody. The plaintiff alleged that, upon information and belief, the application consisted of a neglect petition with accompanying affidavits. On the basis of these documents, the court granted the temporary custody order, scheduled a "ten day hearing" on the continued need for temporary emergency care, as required by § 46b-129 (b), for August 21, 1995, and caused a notice of that hearing to be served on the plaintiff. Following her receipt of the notice of the hearing, the plaintiff, along with counsel, appeared in court on August 21, 1995, intending to contest the custody order. Over the plaintiff's objection, and without requiring or permitting any testimony, the court extended the custody order and scheduled an evidentiary hearing on the order to be combined with a hearing on the underlying neglect petition for March 4 and March 18, 1996, the next available trial dates. Under the court's order, the temporary custody order would remain in effect based upon the ex parte application until the underlying neglect petition could be adjudicated fully.

According to the complaint, the practice of continuing orders of temporary custody for a period of up to several months, without requiring or permitting testimony and based solely upon hearsay statements contained in affidavits and other documents, is common in the Superior Court for Juvenile Matters in Hartford. The practice of consolidating temporary custody orders and neglect hearings, thereby effectively eliminating any separate custody order hearing, is also commonplace. These practices are also alleged to be widespread in juvenile matter districts throughout the state. Furthermore, as a consequence of a dramatic increase in the number of temporary custody order applications brought by the department and the defendants' failure appropriately to perform their official duties, resulting in unreasonably crowded juvenile matters dockets, insufficient staffing in the Superior Court for Juvenile

Matters and inadequate allocation of judicial resources, the following practices are also allegedly widespread throughout the state: (1) beginning presentation of evidence at a ten day hearing, allowing one witness to testify in whole or in part, and continuing the hearing for several weeks or months while extending the temporary custody order in the interim; (2) extending the temporary custody order "without prejudice," indefinitely, without obtaining the parent's knowing and voluntary waiver of her statutory and constitutional rights when the parent appears at the ten day hearing unrepresented by counsel; and (3) failing to convene an evidentiary hearing promptly when an attorney appointed at a ten day hearing subsequently requests one.

The plaintiff claimed that she and the other potential class members and their children have a constitutionally protected right to family integrity and that the defendants, by denying them a fundamentally fair process, have improperly interfered with that right, in violation of their rights under the fourteenth amendment to the United States constitution and article first, § 10, of the Connecticut constitution.[8] The plaintiff sought a declaratory judgment that the defendants' practices violate § 46b-129, as well as the state and federal constitutions, temporary and permanent injunctive or other equitable relief as needed to enforce compliance with state and federal law, reasonable attorney's fees and

---

[8] Section 1 of the fourteenth amendment to the United States constitution provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

such other relief as justice may require. Following the defendants' request to revise, the plaintiff filed a revised complaint that added to paragraph two of the demand for relief a request for specific injunctive relief including: (a) an order directing Ment to establish procedures for all cases in which a temporary custody order is issued ex parte, including, but not limited to, the immediate appointment of counsel for parents; (b) an order directing Ment to allocate sufficient resources to the Superior Court for Juvenile Matters to eliminate the unlawful practices described in the complaint; (c) an order directing Rossi to restore parental custody of any child whose parents have been subjected to the unlawful practices described in the complaint; and (d) such other remedial orders as may be appropriate based on the evidence adduced at trial.

Thereafter, the defendants moved to strike the complaint in its entirety on the ground that it did not make out an appropriate case for a declaratory judgment. Additionally, they moved to strike the relief requested in paragraphs 2 (a) and (b) of the complaint on the grounds that Ment does not have the authority to establish new procedures and that any order by the court would necessarily interfere with his functions and discretion and is therefore barred by sovereign immunity. Finally, they moved to strike the third prayer for relief, paragraph 2 (c), on the ground that a court order directing a blanket termination of temporary custody orders would unduly interfere with Rossi's discretion and is therefore barred by sovereign immunity. Although the trial court, *Hon. Jerry Wagner*, judge trial referee, took no action regarding the motion challenging the declaratory relief, the court agreed with the defendants and granted the motion to strike the relief requested in paragraphs 2 (a), (b) and (c). The defendants then moved to dismiss and/or strike the complaint claiming that the trial court lacked subject matter jurisdiction

over the complaint because the complaint did not state an appropriate case for a declaratory judgment. The trial court, *Sullivan, J.,* disagreed with the defendants and, in an oral decision, determined that the court had jurisdiction over the case, which presented a narrow issue that was appropriate for a declaratory ruling. Pursuant to General Statutes § 52-265a,[9] the defendants sought certification to appeal the denial of their motion to dismiss and/or strike and the plaintiff similarly sought certification to appeal the decision striking her claim for injunctive relief. The Chief Justice granted certification to both parties and these appeals followed.[10] The defendants raise in essence a two part claim, each part of which has subparts. First, the defendants claim that because the trial court correctly struck the plaintiff's

[9] General Statutes § 52-265a provides: "Direct appeal on questions involving the public interest. (a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the Chief Justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a special session of the Supreme Court for the purpose of an immediate hearing upon the appeal.

"(d) The Chief Justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

[10] The defendants claim that the plaintiff's cross appeal is jurisdictionally infirm because she was neither aggrieved by the decision of the trial court denying the defendants' motion to dismiss, nor had she been timely in seeking review of the trial court decision granting the defendants' motion to strike. The Chief Justice clearly had the authority to act pursuant to § 52-265a despite the plaintiff's delay in seeking review of the decision striking her request for relief. See *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 301, 695 A.2d 1051 (1997).

request for injunctive relief, the court cannot grant any practical relief and, therefore, the case is nonjusticiable. This claim is based on two assertions: (1) what the plaintiff wants Ment to do procedurally would supersede the rule-making power of the judges of the Superior Court; and (2) what the plaintiff wants Ment to do administratively, by way of allocation of resources, would violate sovereign immunity. Second, according to the defendants, the trial court improperly refused to strike the plaintiff's prayer for a declaratory judgment because: (1) the case is nonjusticiable; and (2) what the plaintiff wants can, and indeed, should be done on a case-by-case basis, which would be an alternate and effective, appropriate and complete remedy, rendering declaratory relief unnecessary.

The plaintiff, in her cross appeal, claims that the trial court should not have struck her claims for injunctive relief but that it properly refused to strike her claim for declaratory relief. Her arguments mirror the defendants' arguments—whether the case is justiciable, and whether declaratory relief is appropriate. Thus, these claims will be addressed in this opinion together with the defendants' claims.

I

We begin with a brief discussion of certain fundamental principles regarding the standard of review that are applicable to the issues in this appeal. In an appeal from a judgment granting a motion to strike, we operate in accordance with well established rules. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the defendants' motions is plenary. See *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127 (1996) [cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997)]. . . . [W]e

take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); see also *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108–109, 491 A.2d 368 (1985). Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. *Waters* v. *Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996). Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. *Clohessy* v. *Bachelor*, 237 Conn. 31, 33 n.4, 675 A.2d 852 (1996)." (Internal quotation marks omitted.) *Knight* v. *F. L. Roberts & Co.*, 241 Conn. 466, 470–71, 696 A.2d 1249 (1997).

The standard of review of a motion to dismiss is equally well established. In ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. *Mahoney* v. *Lensink*, 213 Conn. 548, 567, 569 A.2d 518 (1990), and cases cited therein. Accepting as true the allegations in the complaint and all facts provable thereunder, in deciding whether a declaratory judgment action in a given case is appropriate, we allow "the trial court wide discretion to render a declaratory judgment unless another form of action clearly affords a speedy remedy as effective, convenient, appropriate and complete." *England* v. *Coventry*, 183 Conn. 362, 365, 439 A.2d 372 (1981). "Furthermore, [if] the plaintiffs' prayer for relief seeks not only a declaratory judgment but also general equitable relief, the plaintiffs are entitled to invoke the long arm of equity to receive whatever relief the court may from the nature of the case deem proper. Any relief can be granted under the general prayer which is consistent with the case stated in the complaint and is supported by the proof provided

the defendant will not be surprised or prejudiced thereby. *Cottrell* v. *Cottrell*, 106 Conn. 411, 419–20, 138 A. 458 (1927), quoting 1 Whitehouse, Equity Practice (1915 Ed.) § 119, p. 223; *Balzano* v. *Balzano*, 135 Conn. 584, 590, 67 A.2d 409 (1949). In sum, at least when there is a prayer for general equitable relief, it is the law in our courts, as it is in the federal courts, that [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon* v. *King & Spalding*, 467 U.S. 69, 73–74, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)." (Internal quotation marks omitted.) *Pellegrino* v. *O'Neill*, 193 Conn. 670, 692, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984).

## II

At issue in this case is the right to family integrity, a right that this court has recognized to be of constitutional significance; *McGaffin* v. *Roberts*, 193 Conn. 393, 400, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); and has elevated to its proper status. *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). The United States Supreme Court has also consistently emphasized the constitutional importance of family integrity. "The rights to conceive and to raise one's children have been deemed essential . . . basic civil rights of man . . . and [r]ights far more precious . . . than property rights . . . . It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . the Equal Protection Clause of the Fourteenth Amendment . . . and the Ninth Amendment . . . ." (Citations omitted; internal quotation

marks omitted.) *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). This right to family integrity does not, however, belong only to the parents. Rather, it "encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the companionship, care, custody and management of his or her children, [id.], and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent, [*Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 844, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977)]." (Internal quotation marks omitted.) *Duchesne* v. *Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). "[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state." (Internal quotation marks omitted.) *In re Alexander V.*, 223 Conn. 557, 561, 613 A.2d 780 (1992). There is little doubt that breaches in the familial bond will be detrimental to a child's well-being. *In re Juvenile Appeal (83-CD)*, supra, 286 and n.11.

Although the state has a substantial interest in protecting minor children; *Stanley* v. *Illinois*, supra, 405 U.S. 649; we have long recognized that intervention in family matters by the state is justified only when such intervention is actually "in the best interest of the child." See General Statutes §§ 17a-112 and 46b-129 (e); *State* v. *Anonymous*, 179 Conn. 155, 165, 425 A.2d 939 (1979). Courts and state agencies, therefore, must keep in mind the constitutional limitations imposed on a state that undertakes any form of coercive intervention in family affairs. Some of the same constraints have been imposed upon the state by the legislature, recognizing the importance of the prompt adjudication of cases in which the state has interfered with the family unit. See

General Statutes § 46b-129 (b). The defendants' challenge to the plaintiff's complaint must be addressed in light of these considerations.

## III

Against this background, we begin our examination of the fundamental question underlying this appeal: Can a court provide the plaintiff any practical relief or is the present action nonjusticiable, i.e., not capable of resolution on the merits by judicial action?[11]

"Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant." (Citations omitted; internal quotation marks omitted.) *State* v. *Nardini*, 187

[11] In light of the procedural posture of this case, the defendants have not yet been called upon to answer the complaint. They do, however, acknowledge that problems exist, that the spirit of § 46b-129 (b) is often defeated and that the situation is serious. The judicial department commissioned a study, in 1996, which concluded that "[t]he increase in emergency orders requested and the time to receive a ten-day emergency hearing has reached a critical point in Connecticut." State of Connecticut Court Improvement Project Report (Edmund S. Muskie Institute, University of Southern Maine, 1996) p. 38. According to the study, there exists "widespread evidence that the 10 day hearing requirement is an issue of great difficulty in the courts due to crowded court calendars. We found evidence in interviews, focus groups, and a docket review of a widespread practice of convening the initial 10 day hearing within the statutory guidelines, introducing the parties into the record to formally initiate the hearing, and then continuing the hearing at a later date. The range of time for the completion of 10 day hearings spanned from 10 days to six months. This is a disturbing instance of compliance with the 'letter' rather than the 'spirit' of the law regarding temporary custody hearings." Id., p. 39. By the time the report was issued, according to representations at oral argument, there have been improvements in expediting these hearings. What declaratory relief, if any, is appropriate is to be determined after a trial based on the facts as they exist at that time and will, of course, depend upon what, if any, constitutional and statutory violations have been proven.

Conn. 109, 111–12, 445 A.2d 304 (1982). The defendants make no claim that this case does not meet the first and second of these requirements for justiciability, actuality of the controversy or adversity of the interests of the parties. They focus on the third and fourth criteria, arguing that the adequacy of judicial resources for the courts is an issue that cannot be adjudicated by judicial authority without violating the principle of sovereign immunity. Specifically, the defendants claim that the injunctive relief requested will cause "undue interference with governmental functions" that are solely within Ment's discretionary duties, and that Ment does not have the authority to order trial judges to alter court procedures to streamline the time involved in juvenile matters.[12] They contend that because there is no practical relief available to the plaintiff, the trial court should have dismissed the action. We are not persuaded.[13]

---

[12] The defendants also argue that any order to restore custody of children to parents who have been subjected to the alleged unlawful practices would similarly interfere with Rossi's functions. The plaintiff withdrew her claim that the trial court improperly struck her request for an order directing Rossi to restore parental custody of any child whose parents are subjected to the alleged unlawful practices. Therefore, we need not address the defendants' argument as to that claim for relief.

Despite the decision by the plaintiff to withdraw her challenge to the trial court order striking her request for injunctive relief directed at Rossi, the defendants have not claimed that the trial court improperly refused to strike the plaintiff's prayer for declaratory relief. In other words, the defendants have not raised the issue of whether, in the absence of the third claim for relief, the one specifically directed at Rossi, the trial court improperly refused to strike the plaintiff's claim for a declaratory judgment that the defendants' practices violate § 46b-129 as well as the state and federal constitutions. Taking it upon himself to make arguments that the defendants *could* have made, but did not, Justice Borden concludes, in his concurring and dissenting opinion, that this case is not justiciable as to Rossi. We are loath to reach and decide issues neither raised nor briefed, particularly when we are remanding the case for an evidentiary hearing to establish the existence of a constitutional violation.

[13] We note at the outset what this case is *not* about. The solution to the problem of delay that the plaintiff apparently seeks is *not* the creation of additional judgeships. "Increases in the number of judges, as well as appointments to the additional positions created, are not within the province

Although the defendants raise the specter of difficulties in crafting "practical relief," the need for creativity and ingenuity on the defendants' part in implementing an appropriate remedy cannot bar the court's assumption of jurisdiction, particularly when the defendants are in the best position to determine what changes are appropriate. Constitutional violations implicating the courts must be susceptible of a judicial remedy. Otherwise, we insulate the judiciary from constitutional challenges and effectively ignore our constitutional obligations.

The plaintiff has alleged that overcrowded court conditions have had and continue to have an adverse impact upon hundreds of children in Connecticut. She relies in part on a report commissioned by the state judicial department, which concluded that in 1996, nearly two thirds of the 3432 neglect petitions filed in the state involved temporary custody orders. State of Connecticut Court Improvement Project Report (Edmund S. Muskie Institute, University of Southern Maine, 1996) p. 18. There can be no doubt that, if proven to exist, the prolonged delays resulting in disruption to families, in the absence of careful and exacting judicial oversight, substantially interfere with the constitutional right of family integrity. Therefore, while the initial disruption may in fact be justified, long delays are not, and indeed they are dangerous.

Although a child's physical and emotional well-being outweighs the interest in preserving the family integrity, the disruption of a child's family environment should

of the judiciary. [See Conn. Const., amend. XX, § 2.] Nor are the defendants, individually or collectively, empowered to add one judgeship to those authorized by General Statutes § 51-165 or to appoint anyone to fill such a position. Those are prerogatives reserved exclusively to the legislature." *Pellegrino* v. *O'Neill,* supra, 193 Conn. 678. Because the plaintiff is not claiming the creation of additional resources as a means of relief or a basis for justiciability, this case does not require us to revisit *Pellegrino*.

not be extended beyond what is unequivocally needed to safeguard and preserve the child's best interests. There is a critical need "to act quickly to maximize [the] child's opportunity either to restore stability to an existing relationship or to facilitate the establishment of new relationships." J. Goldstein, A. Solnit, S. Goldstein & A. Freud, The Best Interests of the Child: The Least Detrimental Alternative (1996) p. 41. We have been properly forewarned of the well recognized harm to children caused by delayed hearings. "Children cannot wait for years for a determination that they should be returned to their natural parents [or] placed permanently in an adoptive home . . . . The delays that are annoying and frustrating to adults . . . can permanently damage children and their families . . . . [Courts] should give highest priority to, and set rapid hearing schedules for, cases where delays will harm children irreparably . . . ." American Bar Association Presidential Working Group on the Unmet Legal Needs of Children and Their Families, America's Children at Risk: A National Agenda for Legal Action (1993) p. 56. It is thus imperative that parents be given a prompt and meaningful opportunity to challenge an order of temporary custody.

It is precisely because state intervention can cause irrevocable consequences for both children and parents that "fundamentally fair" procedures provided in a *timely* manner must be afforded the parties. *Santosky* v. *Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).[14] In short, there must in effect be a

---

[14] Although not previously faced with the precise issue currently before us, we have recognized the potential impact of an ex parte temporary custody order on the subsequent course of proceedings. See *Madigan* v. *Madigan*, 224 Conn. 749, 756–57, 620 A.2d 1276 (1993) (temporary custody order may have significant impact on subsequent custody decision); *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 285–86 (stability and continuity militate in favor of maintaining status quo). We further appreciate the snowball effect that an initial custody determination can have on the ultimate resolution of a case. See *In re Valerie D.*, 223 Conn. 492, 531–32, 613 A.2d 748 (1992).

congruence of rights and remedies. The duty imposed upon the courts to provide a constitutionally adequate system of justice capable of securing the rights and liberties of the people is well recognized. The constitutional obligations to provide justice without undue delay and to afford due process of law must be taken to empower the courts charged with that responsibility to make rules necessary for that purpose. Avenues must be kept free of impediments to open access to the courts.

Our assessment of remedial rights is informed by the nature of substantive rights being vindicated. "Once a right and a violation have been shown, the scope of a . . . court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann* v. *Board of Education*, 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971). Historically, this court has not been hesitant to insist that "the decisive factor must be the vindication of [the plaintiff's] constitutional rights." *Gaines* v. *Manson*, 194 Conn. 510, 529, 481 A.2d 1084 (1984). Whether the remedy is framed as equity "to provide effective, convenient, direct, and complete relief"; *Monroe* v. *Conservation Commission*, 187 Conn. 476, 482, 447 A.2d 1 (1982); or a declaratory judgment that is "peculiarly well adapted to the judicial determination of controversies concerning constitutional rights"; *Horton* v. *Meskill*, 172 Conn. 615, 626, 376 A.2d 359 (1977); a trial court cannot abdicate its responsibility to enforce constitutional mandates merely because remedial solutions may be far reaching or time consuming.

Although we consider the vindication of constitutional rights to be paramount, we recognize that the judiciary must have the power to remedy the unconstitutional delay in order for the case to be justiciable. *State* v. *Nardini*, supra, 187 Conn. 112. Recognition of the inherent power of the judicial branch to operate an

effective system of justice in this state may be found in several statutes. See General Statutes § 51-51v (judges of Superior Court to appoint clerks as well as such administrative and clerical assistants as business of court requires); General Statutes § 51-27 (a) (state required to provide such suitable quarters and furniture as necessary for holding court when there is no suitable location available and to bear expense thereof); General Statutes § 51-27b ("[t]here shall be sufficient offices of the Superior Court for the efficient operation of the court"); General Statutes § 51-27d (a) ("obligation to furnish convenient places for the holding of the Superior Court" imposed on commissioner of public works); see also General Statutes § 4-84 (increased appropriation available for necessary emergency expenditures).

The plaintiff asserts that the complaint in this case does *not* raise a nonjusticiable political question, and the relief requested herein does *not* result in an impermissible intrusion upon the prerogatives and functions of a coordinate branch of government. Contra *Pellegrino* v. *O'Neill*, supra, 193 Conn. 678 (court lacks power to direct legislature to appoint additional judges); *Nielsen* v. *State*, 236 Conn. 1, 9, 670 A.2d 1288 (1996) (court lacks power to compel legislature to define terms of state constitutional spending cap). In *Pellegrino*, this court scoured the complaint for a remedy that would *not* require legislative action but found no allegation that "even suggests that existing judicial resources have not been properly allocated." *Pellegrino* v. *O'Neill*, supra, 684. In the absence of any allegation of improper allocation of judicial resources, we declared that the case involved solely a question that was textually committed to the legislative branch. Id.

This action involves no issue that is constitutionally committed to the legislature, and, therefore, presents no separation of powers obstacles. Rather, the present case seeks to compel the defendants to take steps to

remedy the constitutional and statutory violations plaguing temporary custody order hearings using *existing judicial resources and administrative authority*. We have expressly held that "[i]n the absence of . . . a textual reservation . . . it is the role and the duty of the judiciary to determine whether the [defendants have] fulfilled [their] affirmative obligations within constitutional principles." *Sheff* v. *O'Neill*, 238 Conn. 1, 13, 678 A.2d 1267 (1996).

This case implicates the affirmative obligations imposed on Ment by statute as well as the inherent power of the judicial branch to manage its resources to accomplish its mission of administering justice. Ment's statutory obligations and powers can be found in several statutory provisions. See, e.g., General Statutes §§ 51-5a, 51-5b, 51-8, 51-9, 51-10, 51-10b, 51-11, 51-182 and 51-193*l*. Furthermore, as the agent and appointee of the Chief Justice, who is ultimately responsible for the administration of the judicial branch; see General Statutes § 51-1b; Ment acts from the top of a hierarchical administrative structure and is "responsible for the efficient operation of the department, the prompt disposition of cases and the prompt and proper administration of judicial business . . . ." General Statutes § 51-5a (a) (1). Thus, as a general matter, only he has the perspective to view the entire system and to make the required allocation of resources of the judicial branch. Moreover, because those resources are hydraulic, in the sense that pushing down on or drawing up from one part of them may affect other parts, Ment has very broad discretion to allocate those resources and to provide procedures for the administration of justice within the branch. Generally speaking, it would be incompatible with this statutory scheme to subject his discretion regarding those resources and procedures to the judgment of one Superior Court judge adjudicating an individual or class claim of the violation of constitutional rights. Therefore,

a claim that Ment should reallocate resources and amend or institute certain administrative procedures in order to remedy that violation, would not ordinarily be the appropriate subject of judicial review.

Ment's discretion, however, although broad, is not unbridled, and when that allocation results in a systemic violation of a group of litigants' constitutional rights, or in a pattern or practice that has such a result, a reviewing court may be called upon to consider whether his allocation of resources and governance of administrative practices is constitutionally proper. In *that* instance, the court, affording a heavy presumption of propriety to Ment's administrative allocations, must determine whether that systemic violation may be remedied,[15] for all practical purposes, by a reallocation of

[15] By the use of the term "remedied" we do not mean that, in order for the case to be justiciable, it must be established that Ment can, by reallocating resources and instituting new procedures, *completely solve* the current problem plaguing temporary custody orders. That would be an unrealistic limitation, which would place the question of justiciability unduly beyond attainment. We also do not mean that it would be sufficient for justiciability to establish that a reallocation of resources and new procedures will simply *improve* the situation. Because a trial court does not sit as a kind of super court administrator, it is not within its powers to order Ment to reallocate resources simply because the court deems its judgment as to that allocation to be preferable to Ment's.

We mean, instead, by "remedied" that Ment can *substantially eradicate* the systemic causes of individual constitutional violations. The inquiry for the trial court in this respect will be whether the reallocation of resources, plus administrative and procedural mechanisms, will render the operation of the judicial system free from *systemic*, as opposed to occasional and numerically insignificant, violations of the litigants' rights to a prompt hearing. While the measure of success of the aggregate remedial methods chosen by Ment will be the number and magnitude of constitutional violations still arising subsequent to the implementation of those methods, the existence of individual violations within the judicial department does not necessarily mean that the systemic constitutional violations alleged in the complaint have not been remedied or that a systemic violation has been created elsewhere. We recognize that, given the procedural posture of this case, the defendants have not had to address these issues. It is precisely because we do not yet know what remedial measures are possible or appropriate, or what effect such measures would have on the judicial department as a

resources and the amendment of administrative procedures, without, at the same time, creating a significant risk of other constitutional violations within the judicial department.[16] Therefore, in this case, it may well be that Ment, by reallocating resources and instituting new

whole, that we cannot conclude at this time, as the defendants would have us do, that this case is nonjusticiable.

[16] This limitation is important because it is axiomatic that a trial court cannot be put in the position of vindicating one litigant's constitutional rights by violating the rights of another. Those other constitutional rights might include, for example, the rights of criminal defendants to a speedy trial, the right to a civil jury trial, and the rights of citizens generally to access to the courts. If the trial court were to determine that the systemic violations alleged by the plaintiff could be remedied only by creating a significant risk of these other systemic constitutional violations, the case would then involve, not the reallocation of resources, but the requirement of additional resources. Under that scenario, the case would not be justiciable, because the plaintiff specifically disclaims the creation of additional resources as a basis for justiciability in this case. Despite the frustrations with the plaintiff's claims expressed by Justice Berdon in his concurrence that Ment alter court procedures and allocate sufficient resources to eliminate the alleged unlawful practices described in the complaint and the plaintiff's express disclaimers to any right to additional resources, we do not decide cases irrespective of the pleadings and arguments of counsel.

In his concurring opinion, Justice Berdon conflates the issue of whether we are faced with a type of claim that is appropriate for declaratory relief with the issue of redressability. As this opinion makes clear, we agree with him as to the significance of the constitutional rights at issue that make this case well adapted to judicial determination by way of a declaratory judgment. We are also mindful of our constitutional obligation to provide justice. See, e.g., *Sheff* v. *O'Neill*, supra, 238 Conn. 13–16; *Horton* v. *Meskill*, supra, 172 Conn. 623–28. What courts cannot enforce, however, they cannot decree. *Clarke's Appeal from Probate*, 70 Conn. 195, 209, 39 A. 155 (1898). The reliance by Justice Berdon in his concurrence on *Gaines* v. *Manson*, supra, 194 Conn. 510, is misplaced. Unlike in this case, in *Gaines*, the court had the explicit authority, pursuant to General Statutes § 51-293 (a) (2), to grant the remedy requested by the petitioner appointing special public defenders and the respondent made no claim that the relief requested would violate the separation of powers doctrine. Id., 519–20; see footnote 13 of this opinion. Furthermore, the respondent in *Gaines* made no claim that this relief would be detrimental to the constitutional rights of others. The plaintiff in this case may have to contend with the question of competing constitutional claims if Ment, in order to comply with § 46b-129 (b), reallocates judicial resources and alters administrative procedures as requested. In that event, the plaintiff will have to decide whether to seek: (1) immediate

administrative procedures, *could* remedy the systemic constitutional violations alleged by the plaintiff, without significantly risking those other rights. Only a full evidentiary proceeding will disclose whether that can be accomplished. The plaintiff's claim is, therefore, justiciable.

## IV

Finally, the defendants argue that the complaint is inappropriate for a declaratory judgment action and that individual respondents subject to temporary custody orders should raise their claims in their underlying juvenile court cases. See Practice Book § 390, now Practice Book (1998 Rev.) § 17-55.[17] This argument ignores the realities of the juvenile system in general and the specific record in this case. The trial court represented to the parties in this case that while the court shared counsel's concerns regarding the delay, it was overwhelmed with cases and that "conditions and circumstances entirely outside of" its control dictated the

---

release of her child, a claim she has expressly withdrawn; see footnote 12 of this opinion; (2) additional resources to eliminate the systemic problem at issue, a claim she has expressly withdrawn; see footnote 13 of this opinion; or (3) permission to renew her claims against Governor Rowland, a party she has expressly chosen to eliminate; see footnote 2 of this opinion; and the trial court will then be faced with a cadre of issues. Until then, the trial court first must decide whether the plaintiff can prevail within the existing framework of her complaint.

[17] Practice Book § 390, now Practice Book (1998 Rev.) § 17-55, provides: "[Declaratory Judgments]—Conditions

"The court will not render declaratory judgments upon the complaint of any person:

"(a) unless the party has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; or

"(b) unless there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; or

"(c) where the court shall be of the opinion that the parties should be left to seek redress by some other form of procedure; or

"(d) until all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof."

scheduling. Based upon these representations, it is not reasonable to assume that any individual parent could effectively challenge the denial of a meaningful and timely hearing or that any timely relief would be forthcoming.

First, under the circumstances present in this case, by the time an individual parent can appeal, no remedy will be available.[18] When the temporary custody order is continued and combined with a neglect petition six months after the initial temporary custody order, as it was in this case, one of two things is virtually certain to happen. Either custody reverts back to the parent and the fight to have the issue resolved and the child returned sooner is lost, or the petition results in an adjudication of neglect and a commitment of the child to the department, which commitment legally supersedes the temporary custody order. See *In re Carl O.*, 10 Conn. App. 428, 434, 523 A.2d 1339, cert. denied, 204 Conn. 802, 525 A.2d 964 (1987) (issues involving temporary custody order are moot once child is adjudicated neglected and committed to department).[19]

Second, even if a given case were not moot, because it is unrealistic to assume that an appellate court would return the child to the parent after a judge, although in

[18] In his dissent, Justice McDonald asserts that the plaintiff in this case had a speedy remedy available—to appeal from the continuance of the temporary custody order. Although the basis for this assertion may parallel the mootness concerns expressed herein, we have never held that the granting of a continuance is a final judgment.

[19] Even were the case to fall within the "capable of repetition yet evading review" doctrine, an exception to the mootness doctrine; *Loisel* v. *Rowe*, 233 Conn. 370, 378, 660 A.2d 323 (1995); it is not reasonable to assume that poor people, against whom the majority of ex parte orders are issued, who have had their children returned, will litigate a moot case for the benefit of other indigent parents who might some day find themselves in a similar situation. Furthermore, if a parent stipulates to an adjudication in order to begin the reunification process, there is no vehicle by which to appeal. Cf. General Statutes § 54-94a; Practice Book § 4003, now Practice Book (1998 Rev.) § 61-6.

an ex parte proceeding, had found probable cause for immediate removal, the reviewing court would likely remand the case to the trial court for an immediate custody hearing. This, of course, would only result in further delay and, therefore, further harm.

Third, as a practical matter, there are substantial incentives for parents to settle their underlying neglect cases once a temporary custody order is in place. If the ten day hearing does not take place and the custody order is extended as a consequence, the parent is left with a Hobson's choice. Should the parent consent to a commitment to allow the formal expectations for achieving reunification to commence; see *In re Michael M.*, 29 Conn. App. 112, 125, 614 A.2d 832 (1992); or should the parent continue to contest the case and wait for the hearing date, often months away, in order to contest the removal in order not to have an adverse adjudication in the record? Although the plaintiff in this case chose to litigate the matter, her decision to do so, which could be a function of her particular situation vis-a-vis her child, does not negate the fact that the allegations in this case are more effectively challenged in a declaratory judgment action.

The defendants have acknowledged that there are many cases in which parents are not getting prompt hearings. The studies conducted by the state reflect that is also the case. See State of Connecticut Court Improvement Project Report, supra, pp. 38–39. At the same time, the relief sought by the plaintiff does not require a case-by-case examination. She has withdrawn her claim that the trial court improperly struck paragraph 2 (c) of her demand for relief, which requested an order directing Rossi to restore parental custody of any child whose parents had been subjected to the alleged unlawful practices. The remaining relief sought is institutional in nature and does not depend on establishing that a parent in any given case was subject to

an unconstitutional violation. Establishing liability in this case, therefore, does not depend on a case-by-case determination. Accordingly, we disagree with the defendants' claim that there are more viable avenues available to parents in the plaintiff's situation.

We note, however, that in a case such as the present one, the experience of each member of the class is relevant in enabling the trial court to determine the scope of the remedy. In the exercise of its power under Practice Book § 390, "the trial court . . . has considerable discretion to frame a remedy, so long as that remedy is commensurate with the scope of the constitutional violations which have been established. . . . [At trial] [t]he parties should be afforded the opportunity to offer suggestions for an appropriate remedial order. . . . Just as the judiciary has inherent power to remedy unconstitutional delays in the disposition of civil jury cases . . . so too there is inherent power to remedy unconstitutional delays in [custodial interference cases instituted by the state]." (Citations omitted.) *Gaines* v. *Manson*, supra, 194 Conn. 528–29.

In conclusion, "[w]hile the declaratory judgment procedure may not be utilized merely to secure advice on the law; *Tellier* v. *Zarnowski*, 157 Conn. 370, 373, 254 A.2d 568 [1969]; or to establish abstract principles of law; *Norwalk Teachers' Assn.* v. *Board of Education*, 138 Conn. 269, 272, 83 A.2d 482 [1951]; or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's personal rights; *Gannon* v. *Sanders*, 157 Conn. 1, 9, 244 A.2d 397 [1968]; it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. Practice Book

§ 390 [now Practice Book (1998 Rev.) § 17-55]. The procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances." *Horton* v. *Meskill*, supra, 172 Conn. 627.

## V

This brings us to the last issue, the plaintiff's claim that the trial court improperly struck her claims for injunctive relief. We note that declaratory relief controls state activity no less completely than injunctive relief. The issuance of a declaratory judgment in this action would have the practical effect, even in the absence of a request for injunctive relief, of prompting the defendants to comply with the statute. Moreover, because "declaratory relief controls state activity no less completely than injunctive relief"; *Sentner* v. *Board of Trustees*, 184 Conn. 339, 344, 439 A.2d 1033 (1981); there is no prerequisite that there be a request for injunctive relief, which, indeed, might be redundant. *Housing Authority* v. *Papandrea*, 222 Conn. 414, 424, 610 A.2d 637 (1992). There is clear authority for granting a declaratory judgment without specifically identifying the injunctive relief that might subsequently be ordered should it become necessary. *Sheff* v. *O'Neill*, supra, 238 Conn. 45–46.

This authority does not, however, address the issue of whether the trial court properly granted the defendants' motion to strike the plaintiff's two requests for injunctive relief.[20] The trial court also struck the plaintiff's request for an order directing Ment "to establish procedures for all cases in which [a temporary custody order]

[20] Because the plaintiff has withdrawn her claim that the trial court improperly struck her request for an order directed at Rossi, we need not address that issue. See footnote 12 of this opinion.

is issued ex parte, including but not limited to immediate appointment of counsel for parents" because it would require him "to create new rules of practice or modify existing rules, and this he does not have the power to do." The trial court also struck the plaintiff's request for an order directing Ment to allocate sufficient resources to the juvenile courts to eliminate the unlawful practices complained of because such an order would violate sovereign immunity. We disagree as to both determinations.

We begin with some fundamental principles. First, the court must accept as true the facts alleged in the complaint. *Waters* v. *Autuori*, supra, 236 Conn. 822. Second, Practice Book § 152, now Practice Book (1998 Rev.) § 10-39, allows for a claim for relief to be stricken only if the relief sought could not be legally awarded.[21] The issue then is whether the trial court *could* have ordered Ment to implement procedures to protect constitutional rights and to remedy the alleged violations.

It is undisputed that Ment, as the chief court administrator, has the authority to make rules "relating to the management of the internal institutional machinery of the court system." *Rules Committee of the Superior Court of Connecticut* v. *Freedom of Information Commission*, 192 Conn. 234, 243, 472 A.2d 9 (1984). As

---

[21] Practice Book § 152, now Practice Book (1998 Rev.) § 10-39, provides in pertinent part: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint, counterclaim or cross claim, or of any one or more counts thereof, to state a claim upon which relief can be granted, or (2) the legal sufficiency of any prayer for relief in any such complaint, counterclaim or cross complaint, or (3) the legal sufficiency of any such complaint, counterclaim or cross complaint, or any count thereof, because of the absence of any necessary party, or (4) the joining of two or more causes of action which cannot properly be united in one complaint, whether the same be stated in one or more counts, or (5) the legal sufficiency of any answer to any complaint, counterclaim or cross complaint, or any part of that answer including any special defense contained therein, that party may do so by filing a motion to strike the contested pleading or part thereof. . . ."

"administrative director of the Judicial Department," Ment, may issue such orders as he deems necessary to ensure "the efficient operation of the department, the prompt disposition of cases and the prompt and proper administration of judicial business . . . ." General Statutes § 51-5a (a) (1). We specifically have recognized the power of the chief court administrator to make rules "relating to the management of the internal institutional machinery of the court system." *Rules Committee of the Superior Court of Connecticut* v. *Freedom of Information Commission,* supra, 243. The plaintiff acknowledges that Ment cannot formulate or interfere with rules of practice and procedure that directly control the conduct of particular litigation. In this case, however, Ment is being asked to manage the internal institutional organization of the courts and to implement, if necessary, an administrative overhaul to improve the temporary custody order process. Such administrative tasks do not purport to extend delegation of authority to Ment as to the adjudication of cases.

Given Ment's powers, there is a broad spectrum of available procedures that he could employ as part of the effort to remedy the temporary custody order process. The plaintiff suggests that Ment could "direct juvenile court clerks to allocate more time to [such orders]. He could arrange for additional hours of operation for juvenile courts. He could arrange for the appointment of attorney trial referees to hear contested [temporary custody orders] with the consent of the parties." Furthermore, Ment could order the appointment of counsel for parents immediately upon the issuing of the temporary custody orders. Although Practice Book § 1048.1, now Practice Book (1998 Rev.) § 34-1, currently requires that counsel be appointed for both child and parent, it is silent as to the timing of such appointments. According to the plaintiff, counsel for the child is routinely appointed immediately upon the signing of a temporary custody order. We see no impediment to the

immediate appointment of counsel for parents, and, indeed, it would be consistent with the existing guidelines instituted by Ment's office.[22] Promulgation of these guidelines reflects recognition by Ment that the scope of his authority includes the power to institute procedures governing the conduct of court-appointed counsel in juvenile court cases.[23] The defendants do not suggest that this recent promulgation of guidelines was an improper exercise of Ment's discretion, nor do they distinguish between these actions and the ones proposed by the plaintiff. Therefore, we are unconvinced that the plaintiff's first claim for relief *necessarily* would result in or be tantamount to an impermissible encroaching by Ment upon judicial rule-making authority. Accordingly, at trial if the court were to conclude that the plaintiff had established her allegations, the court could then explore these options to determine whether they would solve the problems.

In her second claim for relief, the plaintiff requests an order directing Ment to allocate sufficient resources to the juvenile courts to eliminate the alleged unlawful practices. The defendants claimed and the trial court concluded that such an order would violate sovereign immunity. We disagree.

[22] A "letter of agreement" regarding the appointment of counsel for children and indigent parents in child protection cases and families with service needs cases was drafted by the judicial department. It requires the signature of all attorneys on juvenile court panels and it contains guidelines to which all attorneys appointed by the court from the panel are expected to substantially conform in individual cases, including interviewing clients within three days following the service of a petition accompanied by an application.

[23] We note other examples of Ment's adoption of procedures regarding the appointment of counsel in juvenile matters. See, e.g., "Application Procedures for Appointment to Panels Providing Legal Representation in Juvenile Matters Cases," 57 Conn. L.J., No. 20, p. 3E (November 14, 1995); "Application Procedure for Appointment to Panel of Counsel Willing to Represent Children and/or Parents in Child Protection Proceedings," 55 Conn. L.J., No. 10, p. 1D (September 7, 1993); "Notice to Attorneys of Application Procedures for Appointment to Panels for Representation in Juvenile Matters," 54 Conn. L.J., No. 19, p. 1C (November 10, 1992).

Sovereign immunity rests on the principle and on the hazard "that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property." J. Block, "Suits against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev. 1060, 1061 (1946). "In a constitutional democracy sovereign immunity must relax its bar when suits against the government complain of unconstitutional acts." *Sentner* v. *Board of Trustees*, supra, 184 Conn. 343. When a state official's acts are in excess of legal authority or constitute an erroneous exercise of that authority, "the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine." (Internal quotation marks omitted.) *Horton* v. *Meskill*, supra, 172 Conn. 624. Therefore, "[t]he state is subject to suit without consent . . . in a suit for injunctive relief when the action does not defeat the purpose of the doctrine of sovereign immunity by undue interference with governmental functions." *Duguay* v. *Hopkins*, 191 Conn. 222, 227 n.4, 464 A.2d 45 (1983).

The defendants argue nevertheless that sovereign immunity bars specific injunctive relief in this case because *any* ordered reallocation of resources would unduly interfere with the governmental functions of the office of the chief court administrator. The defendants rely in large part on General Statutes § 51-164t (b) which gives Ment authority to assign judges "as he deems advisable . . . ." Although we recognize that certain forms of relief could perhaps constitute "radical surgery" by the trial court upon the judicial department and that a court should tread lightly when crafting a specific order of relief, the procedural posture of this case is such that the trial court never made specific

findings of fact regarding the particular resources in question or the level of intrusion on Ment's authority to allocate those resources that would be necessary to remedy the situation. We examine this issue, then, in the context of what is effectively a wholesale attack on the trial court's ability to address the allocation of resources by Ment. We decline the defendants' invitation to issue a blanket prohibition.

There can be no doubt that the judiciary is ultimately responsible for the enforcement of the court rules governing juvenile proceedings and that it must use its power over these matters to prevent action that undermines the spirit of the law and the undue infringement of constitutional rights. Viewing the complaint in its most favorable light, it is evident that the plaintiff claims that by failing to allocate sufficient resources to the juvenile courts, Ment has contributed to the constitutional and statutory violations. When the nonfeasance of a state officer is alleged to violate constitutional rights, the trial court must have the authority to address the situation. See *Savage* v. *Aronson*, 214 Conn. 256, 265, 571 A.2d 696 (1990). To allow that officer to invoke the mantle of sovereign immunity, particularly when the trial court and the offending actor are from the same branch of government, would effectively insulate the defendants from review, render the plaintiff's rights meaningless and "foreclose proper judicial determination of a significant and substantial constitutional question the determination of which is manifestly in the public interest." *Horton* v. *Meskill*, supra, 172 Conn. 628.

We recognize that there are many competing constraints upon the resources the judicial department has available with which to satisfy other constitutional mandates. See, e.g., General Statutes §§ 54-46a (b) and 54-56d (e); Practice Book §§ 635 and 650, now Practice Book (1998 Rev.) §§ 37-1 and 37-12. Such competition does not, however, mean that any court order pertaining

to judicial resources would necessarily hamper Ment's ability to meet those demands or significantly encroach on Ment's authority to manage the affairs of the courts. Whether an order by the court affecting the judicial department's resources to ensure the proper and necessary safeguards in cases of custodial interference would indeed unduly interfere with the judicial department's ability to function or effectively disable another area of the judicial system depends on the particular facts of a given case. In the absence of an evidentiary hearing to establish the existence of a constitutional violation and to explore the parameters of the specific injunctive relief necessary to vindicate the constitutional rights at issue, the defendants' claim must fail. "We have excepted declaratory and injunctive relief from the sovereign immunity doctrine on the ground that a court may fashion these remedies in such a manner as to minimize disruption of government and to afford an opportunity for voluntary compliance with the judgment." (Internal quotation marks omitted.) *Savage* v. *Aronson*, supra, 214 Conn. 266. "Furthermore, trial courts can avoid undue interference with governmental functions by tailoring injunctive relief and scrupulously weighing the equities." *Sentner* v. *Board of Trustees*, supra, 184 Conn. 344.

Because we agree with the plaintiff that the trial court had the authority to grant both claims for injunctive relief, we conclude that the trial court improperly granted the defendants' motion to strike. We reiterate, however, that whether any specific injunctive relief ultimately granted in this case will conform to these principles or will infringe upon powers reserved to Ment is extraneous to whether the court should render judgment for the plaintiff. In addition to injunctive relief, the complaint sought a declaratory judgment that does not transgress the limitations we have imposed on remedies against the sovereign.

In conclusion, the allegations of a deluge of cases, combined with the complaints of inadequate resources with which to process them, work together to deprive aggrieved parents and children of meaningful review of the department's conduct resulting in significant interference with their constitutional rights to family integrity. When we identify a statutory or constitutional violation, it is presumed that the state agency responsible for the violation will act to remedy the problem in accordance with our decision. *Housing Authority* v. *Papandrea*, supra, 222 Conn. 424. Regardless of whether the trial court deems it preferable to render a declaratory judgment and await the defendants' response before acting upon the claims for equitable relief, the court currently has jurisdiction to hear the case and render appropriate relief.

The trial court's decision denying the defendants' motion to dismiss based upon their claim of nonjusticiability is affirmed; the decision striking paragraphs 2 (a) and (b) of the plaintiff's prayer for relief is reversed and the case is remanded to the trial court for further proceedings.

In this opinion NORCOTT and PALMER, Js., concurred, BORDEN, J., concurred with respect to the justiciability of the claims as to Ment, and BERDON, J., concurred in the result.

BORDEN, J., concurring and dissenting. I fully agree with and join the majority opinion regarding the defendant Aaron Ment, the chief court administrator. I dissent only from the conclusion reached by the majority that this case is justiciable as to the defendant Linda D'Amario Rossi, the commissioner of the department of children and families (commissioner).[1]

---

[1] Rossi was the commissioner at the time that the plaintiff commenced this action and has been succeeded in that position by Kristine D. Ragaglia. I refer herein to Rossi as the commissioner because she is a defendant only in her representative capacity.

The majority treats the two defendants as if the claims against them and the relief available from them are the same. They are not. As the complaint now stands, there are no allegations that, taken as true, would support a justiciable claim against the commissioner. Moreover, there is nothing in the majority opinion that suggests either a violation of any litigant's constitutional or statutory rights by the commissioner or a remedy that is within the power of a court to order the commissioner to effectuate.

The plaintiff's complaint originally sought "an order directing [the commissioner] to restore to parental custody any child whose parents are subjected to the unlawful practices described in this complaint . . . ." As the majority notes, however, the plaintiff has eliminated that claim for relief from this case. The only other demands for relief that arguably could apply to the commissioner are: (1) "A declaratory judgment that the [commissioner's] practices described herein violate [General Statutes] § 46b-129 as well as the state and federal constitutions"; and (2) the general claim for "such other remedial orders as may be appropriate based on the evidence adduced at trial."[2]

There are, however, no allegations in the complaint that involve either conduct, or the failure to engage in conduct, by the commissioner resulting in the claimed statutory and constitutional violations of the plaintiff's right to a prompt hearing after issuance of an order of temporary custody—at least no such allegations that

[2] The other two demands for relief are specifically aimed only at the chief court administrator. They are for injunctive or other equitable relief granting: "(a) an order directing [the chief court administrator] to establish procedures for all cases in which an [order of temporary custody] is issued ex parte, including but not limited to immediate appointment of counsel for parents; and (b) an order directing [the chief court administrator] to allocate sufficient resources to the Superior Court for Juvenile Matters to eliminate the unlawful practices described in this complaint . . . ."

could support a justiciable claim. All of the plaintiff's allegations involve the purported failure of the judicial system to afford her such a hearing. It should go without saying that the commissioner has no authority over the operation of the judicial system.

The only allegations that *might* be read as directed at the commissioner are that: (1) "Upon information and belief, these practices [namely, continuing orders of temporary custody for months without taking evidence, and combining the hearings under § 46b-129 with the final hearings] are the result of a dramatic increase in the number of [temporary custody order] applications sought by [the department of children and families]"; and (2) "The conditions described [namely, a dramatic increase in the number of applications for orders of temporary custody sought by the department of children and families, unreasonably crowded juvenile matters dockets, insufficient staffing of the Superior Court for Juvenile Matters, and inadequate allocation of judicial resources] result from the defendants' failure to appropriately perform their official duties." As applied to the commissioner, these allegations amount to a claim that, by bringing more petitions for orders of temporary custody to the court than is justified, she has failed to perform appropriately her official duties. I can discern no other interpretation of these allegations, and the plaintiff has supplied none. In my view, such a claim is nonjusticiable.

The commissioner has the statutory responsibility to file applications for orders of temporary custody when the facts available to her justify such a course of action, in order to protect the health and safety of children. See General Statutes § 17a-101g (c).[3] The commissioner's

---

[3] General Statutes § 17a-101g (c) provides: "If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is

discretionary decision to file such applications is at the core of her executive function. In the absence of allegations that she is systematically exercising this responsibility in an arbitrary, malicious or discriminatory fashion—which allegations the plaintiff has not made—a court does not have the power to engage in second-guessing of that function.[4] Doing so simply because the commissioner's decisions regarding filing applications has resulted in an overload on the judicial system would violate the principle of the separation of powers. Nothing in the majority opinion suggests why a court would have the power to engage in such a process of executive oversight. As to the commissioner, therefore, I would affirm the judgment of the trial court, *Wagner, J.*, striking certain of the plaintiff's demands for relief, and I would reverse the judgment of the trial court, *Sullivan, J.*, denying the commissioner's motion to dismiss.

BERDON, J., concurring in the result. I agree with the result reached by the majority.[1] Nevertheless, I have

necessary to ensure the child's safety, the commissioner, or his designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section."

[4] Indeed, at oral argument before this court the plaintiff clarified her allegations by asserting that the commissioner is "abusing her discretion" by seeking too many orders of temporary custody. In my view, this clarification adds nothing to the justiciability of the claim against the commissioner. Whether to seek such an order in any given case is a uniquely fact-bound, discretionary decision. As I indicate in the text of this opinion, the exercise of that discretion lies at the core of her executive power. I see no basis for a court to go beyond its judicial function of determining whether a petition is based on probable cause, by reviewing, on an abuse of discretion basis, the commissioner's decision to bring the petition in the first place. Oversight of that discretionary decision is no more a judicial function than oversight of a state's attorney's decision to prosecute "too many crimes."

[1] I agree that the trial court's denial of the motion to dismiss should be sustained and that the striking of the injunctive relief claims should be reversed, and those claims of relief reinstated.

substantial disagreement with the reasoning of the majority with respect to the issue of justiciability. I write separately to explain why I believe that, pursuant to the federal constitution,[2] the action brought against the named defendant, Aaron Ment, the chief court administrator, and the defendant Linda D'Amario Rossi, commissioner of the department of children and families (department), jointly referred to as the state,[3] is justiciable. And to make my position perfectly clear, to the extent that the majority seems to separate the justiciability of the action from the justiciability of the remedy in its unusual analysis in footnote 15 and the accompanying text of its opinion, it is my view that this action is justiciable with respect to both.

Identification of the basic issue in this case not only answers the issue of justiciability, but also, based on the undisputed facts, the merits of the plaintiff's action.

---

[2] This action was brought under both the federal and state constitutions. Because the federal constitution sets the floor below which the states are not free to go; *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990); for the purposes of this opinion, I focus solely on the plaintiff's federal constitutional rights. Accordingly, I need go no further than determining that the case is justiciable under the federal constitution. I find the majority opinion confusing when it relies on cases that involve only the state constitution as being determinative of the justiciability issue. *Pellegrino* v. *O'Neill*, 193 Conn. 670, 678, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984) (holding nonjusticiable action seeking to have judiciary, in order to implement state constitutional right to justice without delay, direct legislature to create additional judgeships); *Nielsen* v. *State*, 236 Conn. 1, 9, 670 A.2d 1288 (1996) (holding that plaintiffs' action seeking to compel legislature to enact certain statutory definitions necessary to implement spending cap contemplated by adoption of article third, § 18, of state constitution was nonjusticiable).

[3] Because Ment and Rossi have "been sued concerning some matter in which [they represent] the state and the state, though not a named defendant, is the real party against whom relief is sought, so that the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability, [this] suit is, in effect, one against the state . . . ." (Internal quotation marks omitted.) *Rogan* v. *Board of Trustees*, 178 Conn. 579, 582, 424 A.2d 274 (1979).

The issue is whether, after a child is removed from the care and custody of his parent on allegations of neglect, the parent is entitled to a timely hearing, at least within the statutorily mandated ten day period,[4] wherein the state must prove neglect and that the child's best interests require that he remain in foster care. The answer is obvious—due process of law requires such a hearing in a timely manner. Accordingly, in my view, not only is this case justiciable, but on remand, after the class is certified, it is a classic case for summary judgment for the plaintiff and the class with respect to their claim that their constitutional rights have been violated.

I begin by setting forth the undisputed facts underlying the plaintiff's action. On August 8, 1995, social workers from the department seized Jonathan B., the nineteen month old child of the plaintiff Pamela B., pursuant to the provisions of General Statutes § 17a-101g (c), which authorizes the removal of a child for ninety-six hours upon probable cause to believe the child is in imminent risk of physical harm.[5] On August 11, 1995, three days after the department seized Jonathan B. from his mother, the department filed a petition in the Superior Court seeking to commit Jonathan B. as a neglected child. The department also sought a ten day order of temporary custody pursuant to General Statutes § 46b-129 (b). The trial court, without notice

[4] Although Connecticut defines a timely hearing as one occurring within ten days of the removal of the child, a ten day hearing is more than three times longer than that recommended by the National Council of Juvenile and Family Court Judges in Resource Guidelines: Improving Court Practice in Child Abuse and Neglect Cases (1995).

[5] At oral argument, counsel for the plaintiff represented that the department relied upon the following for the removal of the child: "There were concerns about the medical condition of the child and the mother's alleged failure to obtain appropriate medical treatment, and there were concerns about a boarder who was living in the apartment—no concerns about any abuse by the boarder, but it was claimed that the mother couldn't control the boarder, couldn't get the boarder out of the apartment . . . ."

to the plaintiff and in the confines of his chambers, on an ex parte basis, granted the temporary custody order.[6]

On the tenth day after Jonathan B.'s removal, the plaintiff appeared before the trial court with her attorney prepared to challenge the allegations of neglect, only to be told by the trial judge that the matter could not be heard that day, that the hearing had to be continued for approximately six months during which period the temporary custody order would be continued and the child would remain in foster care. The trial judge also told the plaintiff that he shared her concerns about being deprived of the custody of her child but he was "overwhelmed" with other cases and "that conditions and circumstances entirely outside his control dictated the scheduling." The plaintiff duly objected to the delay of this hearing.

At oral argument before this court, the state conceded that the failure to grant hearings on the tenth day—the focus of this action—is common among juvenile court judges. Indeed, a 1996 report commissioned by the state judicial department "found evidence in interviews, focus groups, and a docket review of a widespread

---

[6] The plaintiff curiously does not challenge the constitutionality of General Statutes § 46b-129 (b) which, in relevant part, allows the state to obtain an ex parte order without notice to the parent "[i]f it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall . . . (2) vest in some suitable agency or person the child's or youth's temporary care and custody *pending a hearing upon the petition which shall be held within ten days from the issuance of such order* on the need for such temporary care and custody. . . ." (Emphasis added.)

Section 46b-129 (b) also provides an alternative route for removing a child by providing, in relevant part, that the court shall "(1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition . . . ."

practice of convening the initial 10 day hearing within the statutory guidelines, introducing the parties into the record to formally initiate the hearing [in order to technically comply with the temporary custody order], and then continuing the hearing at a later date. The range of time for the completion of 10 day hearings spanned from 10 days to six months." State of Connecticut Court Improvement Project Report (Edmund S. Muskie Institute, University of Southern Maine, 1996) p. 39.[7]

The plaintiff filed this action and sought certification as a class action, seeking (1) a judgment declaring that the state's failure to conduct temporary custody order hearings within ten days after children are removed from their parents violates § 46b-129 and the plaintiff's fundamental federal and state constitutional due process rights, and (2) equitable relief by way of an injunction compelling the state to conduct timely temporary custody order hearings. The state moved to dismiss the plaintiff's action on the ground that it is not justiciable, which motion the trial court denied. The trial court, however, granted the state's motion to strike the plaintiff's equitable claims for an injunction. Both rulings are before us.

Let me first put the issues raised in this case in their proper perspective. This case involves the plaintiff's fundamental federal constitutional liberty interests in the companionship, care, custody and management of her child. *Santosky* v. *Kramer*, 455 U.S. 745, 758, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977); *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31

---

[7] The State of Connecticut Court Improvement Project Report was the result of the federal requirement for a comprehensive assessment of the performance of state courts with respect to their adjudication of allegedly abused children.

L. Ed. 2d 551 (1972). "This right to family integrity [which is shared by the parent as well as the child, *Santosky* v. *Kramer*, supra, 760], includes the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). "[F]ew consequences of judicial action are so grave as the severance of natural family ties." (Internal quotation marks omitted.) *M. L. B.* v. *S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996).

This court recognized in *In re Juvenile Appeal (83-CD)* that: "Studies indicate that the best interests of the child are usually served by keeping the child in the home with his or her parents. 'Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments.' Institute of Judicial Administration—American Bar Association, Juvenile Justice Standards Project, Standards Relating to Abuse and Neglect, p. 45 (Tentative draft, 1977) . . . . The love and attention not only of parents, but also of siblings, which is available in the home environment, cannot be provided by the state. Unfortunately, an order of temporary custody often results in the children of one family being separated and scattered to different foster homes with little opportunity to see each other. Even where the parent-child relationship is 'marginal,' it is usually in the best interests of the child to remain at home and still benefit from a family environment." *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 285–86.[8] We have made it clear

---

[8] Congress enacted the Adoption Assistance and Child Welfare Act of 1980, Pub. L. 96-272, codified as 42 U.S.C. §§ 620 through 627 and 670 through 678, a major purpose of which is to ensure the occurrence of timely and safe reunifications of children with their biological parents, when possible.

that this "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 279–80, 618 A.2d 1 (1992).

The amici curiae, a group of social scientists, legal advocates and other groups concerned with the rights and welfare of children,[9] point out the critical importance of stability for the appropriate development of the child. "Continuity of relationships is essential for a child's healthy development. . . . Since continuity may not play as significant a role in later life, its importance may be underrated by adult decision-makers. [A child's] growth may be disrupted when upheavals and changes in the external world are added to the inevitable internal ones . . . because emotional attachments are tenuous and vulnerable in early life, and children need stability of relationships for growth and development." J. Goldstein, A. Solnit, S. Goldstein & A. Freud, The Best Interests of the Child; The Least Detrimental Alternative (1996) pp. 19–20. Indeed, as the amici point out by quoting from the American Bar Association Presidential Working Group on the Unmet Legal Needs of Children and Their Families, America's Children at Risk: A National Agenda for Legal Action (1993) p. 56: "Children cannot wait for years for a determination that they should be returned to their natural parents [or] placed

[9] The amici curiae in this case are the Center for Children's Advocacy, Inc., Jerome N. Frank Legal Services Organization, Children's Law Center, Inc., Connecticut Civil Liberties Union Foundation, Connecticut Legal Services, Inc., New Haven Legal Assistance Association, Inc., Greater Hartford Legal Assistance, Inc., Bridgeport Child Advocacy Coalition, Social Work Department, St. Joseph's College, and Citizens for Connecticut's Children and Youth.

permanently in an adoptive home . . . . The delays that are annoying and frustrating to adults . . . can permanently damage children and their families . . . ."

With this background in mind, I agree with the majority that the plaintiff's action is justiciable. The difference between our views, if I correctly understand the majority opinion, is that, in my view, the plaintiff's action is justiciable and should be decided on the merits; and in the majority's view, the action is presumptively justiciable at this time, but it may not be justiciable after the trial court conducts a full evidentiary hearing. The majority's presumption that this case is justiciable with respect to Ment, however, hangs on a thin thread. According to the majority's unprecedented theory of constitutional "hydraulics," "[i]f the trial court were to determine that the systemic violations alleged by the plaintiff could be remedied only by creating a significant risk" of other constitutional violations within the judicial department, the case would be nonjusticiable. The majority goes further and holds that the trial court, in applying this theory of constitutional "hydraulics," must grant "a heavy presumption of propriety to Ment's administrative allocations" of resources when it conducts its evidentiary hearing. Under those circumstances, it is highly unlikely the trial court will find that Ment can remedy the systemic violations. In other words, the majority would have us believe that the state could remove a child from a parent's custody on the ground of neglect and then deny that parent a timely hearing if Ment could prove insufficient resources caused the delay. This reasoning is fundamentally flawed.

The plaintiff, to a certain degree, invited this constitutional "hydraulics" argument. As a result of the state's request for a more specific statement, the plaintiff amended her prayer for relief by indicating that Ment should be required to "allocate sufficient resources to

the Superior Court for Juvenile Matters to eliminate the unlawful practices described in her complaint." By amending the complaint in this manner, the plaintiff allowed the state to focus its defense on the alleged unconstitutionality of a court ordering Ment to allocate more judicial resources. It was a good ploy by the state and the majority of this court has swallowed it—hook, line and sinker. In doing so, the majority not only loses sight of the plaintiff's request for declaratory relief, but also, our decisions in *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977), and *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996). The majority, however, undermines the very foundation of cases like *Sheff* and *Horton.*

In today's confusing opinion, the majority holds that the trial court cannot grant declaratory relief if the state can prove that the specific injunctive relief demanded by the plaintiff will infringe upon the constitutional rights of other litigants. Both *Horton* and *Sheff*, however, make it clear that for federal and state constitutional violations, the trial court may grant a judgment declaring the conduct to be unconstitutional without specifically identifying the injunctive relief that might subsequently be ordered should it become necessary. *Sheff* v. *O'Neill*, supra, 238 Conn. 1 (holding by declaratory judgment that disparities in access to unsegregated educational environment infringed upon plaintiffs' fundamental state constitutional right to substantially equal educational opportunity); *Horton* v. *Meskill*, supra, 172 Conn. 615 (holding by declaratory judgment that state system of financing public elementary and secondary education violates plaintiffs' fundamental state constitutional right to education). Moreover, we have made it crystal clear that "[i]n the event that a declaratory judgment action should decide that certain acts of state officials violated the constitution, we presume that the official would accede to that decision."

*Sentner* v. *Board of Trustees*, 184 Conn. 339, 344, 439 A.2d 1033 (1981); *Housing Authority* v. *Papandrea*, 222 Conn. 414, 424, 610 A.2d 637 (1992). Thus, in this case, we may presume that the state, once ordered by the trial court, will take the necessary action to correct the unconstitutional delays in temporary custody order hearings.

Any suggestion that this unusual theory of constitutional "hydraulics" can dissipate the fundamental federal constitutional rights of the plaintiff class—rights that do not depend upon the state's resources, Ment's discretion or any other such state consideration—is also unavailing. The majority cites to no law, and I doubt that any could be found, that would suggest that the violation of the federal procedural and substantive due process rights of the plaintiff can be trumped if the state cannot remedy these violations of individual constitutional rights without, at the same time, causing other constitutional violations to occur. In my view, it would be appropriate for the trial court in this case to grant the plaintiff's request for general injunctive relief, leaving it up to the state, Ment and the department, to figure out how to remedy the due process violations. Therefore, whether the remedy can be accomplished administratively by the department assigning more caseworkers to determine whether there is probable cause that a child has been abused, by making more social services available to the parent, rather than removing children on a wholesale basis, by Ment administratively assigning more judges to the juvenile courts, or by some other appropriate remedy,[10] should have no

[10] The State of Connecticut Court Improvement Project Report, supra, contained the following recommendations for the judicial department to ensure that temporary custody order hearings are scheduled and heard within a reasonable time: (1) use "judicial resources from other Superior Court Divisions, including senior judges and trial referees"; id., p. 67; (2) use "specialized hearing officers who are assigned and supervised by the presiding judge"; id.; and (3) supply juvenile court judges with technological

bearing on this court's determination of the justiciability of the plaintiff's action. In fact, this court recognized in *Gaines* v. *Manson*, 194 Conn. 510, 529 n.18, 481 A.2d 1084 (1984), that " '[i]nadequate resources no longer can excuse the denial of constitutional rights.' *Todaro* v. *Ward*, 565 F.2d 48, 54 n.8 (2d Cir. 1977); *Milliken* v. *Bradley*, 433 U.S. 267, 289–90, S. Ct. 2749, 53 L. Ed. 2d 745 (1977); *Ruiz* v. *Estelle*, 679 F.2d 1115, 1146–47 (5th Cir. 1982), cert. denied, 460 U.S. 1042, 103 S. Ct. 1438, 75 L. Ed. 2d 795 (1983); *Finney* v. *Arkansas Board of Correction*, 505 F.2d 194, 201 (8th Cir. 1974)." See *Swann* v. *Board of Education*, 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) ("[o]nce a right and a violation have been shown, the scope of a . . . court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"); *Detainees of Brooklyn House of Detention for Men* v. *Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975) ("[i]nadequate resources of finances can never be an excuse for depriving detainees of their constitutional rights").

Nevertheless, the majority would have us believe, based upon its theory of justiciability, that Ment could give priority to protecting mere property rights over that of the familial privacy rights in one's child when allocating judicial resources. In other words, Ment, according to the majority, in exercising his discretion, could give priority to the assignment of judicial resources to assure that there is probable cause before a nonpossessory lien attaches to real estate over the assignment of judicial resources to protect parental rights with respect to the custody of children. See, e.g., *Connecticut* v. *Doehr*, 501 U.S. 1, 16–18, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991) (holding that ex parte determination of probable cause is insufficient under due process

---

and personnel support that will "enable them to do their job more efficiently and thoroughly." Id., p. 28.

clause for nonpossessory lien such as attachment);
*General Electric Supply Co. v. Southern New England
Telephone Co.*, 185 Conn. 583, 591, 441 A.2d 581 (1981)
("[i]t is well established that deprivation of the use and
possession of property without a hearing violates the
due process clause of the fourteenth amendment"). I
strongly disagree with this suggestion. The liberty inter-
ests in the companionship, care, custody and manage-
ment of one's child can never be subordinated to the due
process rights of another in order to protect interests in
mere property.[11]

Although the formal record of this appeal will indicate
that the denial of the state's motion to dismiss is
affirmed and the striking of the injunctive relief sought
by the plaintiff is reversed, the majority's blueprint for
the future of this litigation is dismal for the plaintiff
and her child, as well as others similarly situated. I am
dismayed over the fact that the majority, by conferring
on Ment the broad discretion of determining that the
plaintiff's constitutional rights can be displaced
"hydraulically" by the rights of others, not only demeans
fundamental constitutional rights of poor persons, like
the plaintiff here,[12] but also comes close to sending
those rights into oblivion.[13]

---

[11] "Cases involving children, whether they are criminal or civil, should
immediately be given priority in *all* court systems—trial and appellate, civil
and criminal. . . . [Courts] should give highest priority to, and set rapid
hearing schedules for, cases where delays will harm children irreparably
. . . ." (Emphasis in original.) American Bar Association Presidential Work-
ing Group on the Unmet Legal Needs of Children and Their Families, Ameri-
ca's Children at Risk: A National Agenda for Legal Action (1993) p. 56.

[12] The majority opinion, with respect to its theory of constitutional "hydrau-
lics," will have the most severe impact on the poor, those persons who are
least able to fend for themselves. You can be assured that if a child is
removed from the custody of an affluent parent, that parent would not be
required to wait six months for a temporary custody order hearing. Indeed,
it would be unlikely that the affluent parent would be required to wait ten
days for a hearing.

[13] Although I do not agree with the dissent of Justice McDonald, I do agree
with his forthright comment that as a result of the majority's theory of

PALMER, J., concurring. I join the opinion of the majority. I write separately only because I would take a different approach than the majority with respect to our resolution of the claim of nonjusticiability by the defendant Linda D'Amario Rossi, commissioner of children and families (commissioner).

For the reasons articulated by Justice Borden in his concurring and dissenting opinion, there exists a serious question as to whether the claims of the plaintiff, Pamela B., against the commissioner are justiciable. As the majority points out, however, the commissioner never made the argument in favor of nonjusticiability that Justice Borden finds persuasive; consequently, the plaintiff never has had the opportunity to address that argument. In such circumstances, I, like the majority, am reluctant to decide the question. If, however, Justice Borden is correct that the plaintiff's claims against the commissioner are nonjusticiable, then we do not have subject matter jurisdiction over those claims. Accordingly, I would order the parties to submit supplemental briefs on the issue so that we properly may decide it. Because my colleagues do not share the view that supplemental briefs are appropriate, however, and because I am not absolutely certain, absent any input from the plaintiff, that Justice Borden is correct in his conclusion that the plaintiff's claims against the commissioner are nonjusticiable, I concur with the majority that we should not decide this issue.

MCDONALD, J., dissenting. I concur with Justice Borden that the action as to the defendant Linda D'Amario Rossi, commissioner of children and families, is not justiciable and should be dismissed. I also believe the action as to the named defendant, Aaron Ment, chief court administrator, should be dismissed.

constitutional "hydraulics," "the failure of the plaintiff's case appears preordained."

I agree it is unjust, as alleged, to deprive a parent of the custody of his or her child and to misadminister the judicial branch so as to create a system wide delay in child custody hearings. Here, however, the court should not be engaged in policy matters left to the legislature and the governor. The plaintiff also failed to bring an action against the parties from whom she could obtain practical and real relief. Finally, the plaintiff had an effective remedy that she abandoned.

It could be said that this case is not justiciable because it involves a policy decision to allocate resources that is reserved to the legislature. *Pellegrino* v. *O'Neill*, 193 Conn. 670, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984). Judges are not appointed to be social engineers. *Claremont School District* v. *Governor*, 142 N.H. 462, 477, 703 A.2d 1353 (1997) (Horton, J., dissenting).

It could also be said that the named defendant, the chief court administrator, is not the policy maker for the judicial branch. The policy makers, the judges of the Superior Court, headed by the chief justice, are the necessary parties in whose absence no effective relief can be granted. See General Statutes §§ 51-1a, 51-1b; *State* v. *Nardini*, 187 Conn. 109, 111–12, 445 A.2d 304 (1982). Nevertheless, the majority orders a trial to determine if the plaintiff's case is justiciable. It directs a trial judge to determine if "substantial" steps can be taken to avoid these delays in child custody hearings. If such steps cannot be taken using the present available resources without affecting the constitutional rights of other litigants, the case will be dismissed.

To allow this case to continue in this manner does a disservice to children and parents where charges of child abuse are made. The plaintiff had a speedy, effective, convenient, appropriate and complete remedy

available by way of appellate review.[1] See General Statutes § 52-265a; *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). Those are grounds to dismiss this independent injunctive and declaratory judgment action. See Practice Book § 390 (c), now Practice Book (1998 Rev.) § 17-55 (3); *England* v. *Coventry*, 183 Conn. 362, 439 A.2d 372 (1981). Had such an appeal been taken in 1995 from Judge Lavine's continuance of the ten day hearing and had the plaintiff prevailed, a decision would have been rendered long ago promptly vindicating her rights to the hearing.

This case brought, instead, only further trial court proceedings protracted into 1997. While the action was pending, the plaintiff voluntarily relinquished her rights to her child and that issue is not before us. She nonetheless claims to pursue other parents' rights. This may mislead those parents to forgo effective appellate relief and to join this futile case[2] inching its way through the overcrowded civil dockets. If this case were dismissed, those other parents would seek this effective speedy relief and avoid the "dismal" prospects for this case, which "comes close to sending [their] rights into oblivion." See concurring opinion of Justice Berdon.

I would affirm the decision of Judge Wagner granting the motion to strike the claim for injunctive relief and reverse the decision of Judge Sullivan denying the motion to dismiss.

---

[1] Judge Lavine's order directly affected the plaintiff's custody rights, suspending them without a hearing for six months. Precisely because of that suspension we undertook to review the otherwise interlocutory orders in this case that only indirectly affected the plaintiff's rights. An appeal from Judge Lavine's order could have been taken in the same manner as in this case.

[2] Indeed, where the plaintiff must overcome a heavy presumption that the chief court administrator acted properly and in view of the reality of mounting juvenile and adult criminal cases and ever increasing family and civil dockets, the failure of the plaintiff's case appears preordained.