MEMORANDUM OF DECISION
This memorandum of decision addresses petitions for termination of the parental rights (TPR) of Laurie V. and Jeffrey F., the biological parents of the minor children James F. and Jeanne F. The Department of Children and Families (DCF) filed these petitions on January 25, 2001, originally alleging that both parents have abandoned the children, and have failed to achieve rehabilitation. On May 11, 2001, the petition was amended to specifically allege the ground of no ongoing parent-children relationship against the respondent father, in conformity with the Summary of Adjudicatory Facts which had accompanied the original TPR petitions.[2]
On June 14, 2001, Laurie V. tendered her consent to the TPR petition, and the court (Quinn, J.) accepted her consent after canvass: thereafter, the TPR petition against Laurie V. was amended to reflect the sole ground of consent. The petitioner and James F. have stipulated that this court shall apply the adjudicatory date of May 11, 2001 in assessing the pending claims. For the reasons set forth below, the court finds this matter in favor of the petitioner, and so has terminated the parental rights of Jeffrey F. and Laurie V.
The file reflects that on DCF had obtained an Order of Temporary Custody (OTC) for both children on May 19, 1998. (Peck, J.) On November 25, 1998, after a contested hearing, James F. and Jeanne F. were adjudicated neglected children, and were committed to DCF for a period of twelve months. (Harleston, J.) The children have remained in DCF custody since that date, pursuant to court-ordered extensions of commitment. One CT Page 12703 year later, on November 15, 1999, the court determined after hearing that reasonable efforts to reunify these children with Laurie V. were no longer appropriate. (Harleston, J.) On May 11, 2000, after hearing, the court further determined that reasonable efforts to reunify these children with Jeffrey F. were no longer appropriate. (Harleston, J.)
Trial of this highly-contested matter was held before this court on July 11 and 12, 2001. The petitioner, Jeffrey F. and the children were vigorously and effectively represented by counsel throughout the proceedings.
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the children.
 I. FACTUAL FINDINGS
The Court has thoroughly considered the verified petitions and the multiple other documents submitted in evidence, including the social study and addendum, reports of mental health providers, police and conviction records, specific steps and a service agreement. The court has utilized the applicable legal standards[3] in considering this evidence and the testimony of trial witnesses, who included DCF personnel, a psychologist, a police officer, service providers, the foster father and Jeffrey F. Upon review, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF NOVEMBER 25, 1998
Jeffrey F. was born on March 13, 1963 and Laurie V. was born on June 10, 1962: at the time of trial, they were 38 and 39 years old, respectively. Jeffrey F. left school in the eleventh grade, and received his GED diploma in 2000. He has been employed as a tool and die maker. (Exhibit 1.)
Jeffrey F. and Laurie V. met in 1987, and began a long, disruptive romantic relationship, marked by over-consumption of alcohol and repeated domestic violence. (Testimony of Jeffrey F., Deena M.) Jeffrey F. and Laurie V. have never married. (Exhibit 10.)[4] Their first child, James, was born on December 1991. Their second child, Jeanne, was born on March 1993. The children and Laurie V. resided, for the most part, with the maternal grandparents, who served as primary caretakers for James and Jeanne. (Exhibit 1.)
This family first came to the attention of DCF in April 1997, upon referral by the family relations officers at G.A. 13, who were working CT Page 12704 with Jeffrey F. and Laurie V. in connection with a persisting Series of domestic violence arrests. DCF substantiated allegations of emotional neglect involving both James and Jeanne, and the children remained in residence with Laurie V., while DCF continued protective services. (Testimony of Deena M.) In May 1998, Jeffrey F. and DCF entered into a service agreement, with the goal of achieving family safety and security, for the protection of James and Jeanne. (Exhibit 11.) DCF offered Jeffrey F. a substance abuse referral at that time, but he did not participate. DCF then received a referral from the school system, reflecting complaints that Laurie V. was abusing substances, that Jeffrey F. was present at her home notwithstanding court orders prohibiting such conduct, and that James had made statements indicating his intention to harm himself. (Testimony of Deena M.) As noted above, DCF obtained an OTC for both James and Jeanne on May 19, 1998, and they were placed in foster care. They were moved to another foster home on July 10, 1998, where they have remained in residence. (Testimony of Deena M.)
In June 1998, nearly a year after the agency began working with the family, Jeffrey F. agreed to participate in DCF sponsored services. DCF directed him to the Genesis Center (Genesis) for substance abuse assessment; referred him to Richard M. at Interface Counseling for anger management therapy; and recommended a selection of parenting education providers. Jeffrey F. attended the Genesis evaluation, where he admitted a history of alcohol abuse that commenced at age fourteen, with marijuana and frequent cocaine use that continued well after James and Jeanne were born. (Exhibits 1, 4; Testimony of Deena M.) Jeffrey F. also admitted a history of domestic violence and physical violence toward others, acknowledging that some years ago "he and a friend got into an altercation and that he hit his friend in the face shattering his facial bones." (Exhibit 4.) The Genesis Staff diagnosed Jeffrey F. with Alcohol Abuse, and recommended that he attend group therapy to address his denial and help him plan for abstinence. (Exhibits 1, 4; Testimony of Deena M.) From September 29 to December 8, 1998, Jeffrey F. engaged Genesis's services on three separate occasions: interruptions in treatment were necessitated when this respondent was repeatedly arrested and incarcerated.[5] In all, Jeffrey F. attended a total of eight group therapy sessions at Genesis. Thereafter, Genesis recommended that Jeffrey F. participate in AA support groups, but he refused to attend. Jeffrey F. attended two individual anger management counseling sessions with Richard M., but he failed to participate any further. (Exhibit 1; Testimony of Deena M.)
As noted above, the children were placed in DCF's custody as the result of the OTC issued on May 19, 1998, and the neglect adjudication that followed on November 25, 1998. (Testimony of Deena M.) On the latter date, the court imposed specific steps for Jeffrey F., requiring him, CT Page 12705 among other things, to keep his whereabouts known to DCF; participate in parenting and individual counseling directed at his problems with anger, domestic violence and substance abuse; follow the recommendations of the Genesis Center; successfully complete substance abuse treatment and follow recommendations regarding aftercare treatment, including relapse prevention; and avoid involvement with the criminal justice system. (Exhibit 12.)
I. B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF NOVEMBER 25, 1998
After the neglect adjudication, DCF provided supervised visitation for Jeffrey F. and the children using the services of the KidSafe program. This visitation was only briefly effective however, due to Jeffrey F.'s arrest, described below. (Testimony of Deena M.)
Jeffrey F. failed to attend a Genesis group session that was scheduled to take place on December 8, 1998. (Exhibit 5.) Several days later, a DCF caseworker met with Laurie V., and noted that she had two black eyes, a swollen nose, and cuts above both eyes and her nose: Laurie V. claimed to have acquired these injuries as the result of a recent assault by Jeffrey F.[6] Jeffrey F. was arrested for this alleged assault, and incarcerated in lieu of bond from December 11, 1998 through October 5, 1999. During the entire period of his confinement, which lasted nearly ten months, Jeffrey F. specifically requested that DCF refrain from bringing the children to visit with him, although visitation could have been facilitated. (Exhibit 1; Testimony of Deena M.) On October 5, 1999, after a jury trial, Jeffrey F. was acquitted of the pending assault charges. At his release, the court issued a criminal protective order prohibiting him from having further contact with Laurie V. or her dwelling. (Exhibit 6; Testimony of Timothy V.)
In early October 1999, soon after his release from the Department of Corrections (DOC), Jeffrey F. contacted DCF and requested resumption of visitation. DCF reviewed the pending specific steps with Jeffrey F., arranged for his substance abuse assessment with Advanced Behavioral Health (ABH), and again provided this respondent with information regarding parenting education programs. (Testimony of Deena M.)
Before visitation could commence, on October 31, 1999, Jeffrey F. was arrested again, this time for violation of the criminal protective order that had been issued by the court earlier in the month. (Testimony of Timothy V.) Jeffrey F. was again held in lieu of bond, and he returned to his previous, full-time employment upon release nearly a year later, in November of 2000. (Exhibit 1; Testimony of Tammy S., Deena M., Shirley D.) During this lengthy period of incarceration, as well, Jeffrey F. elected not to have any visitation with the children, although DCF was CT Page 12706 willing to facilitate father-children contact. As indicated above, on May 11, 2000, while Jeffrey F. was confined, the court ruled that further reunification efforts were no longer appropriate.
Upon his release from the DOC, however, Jeffrey F. renewed his request for resumption of visitation with the children. By this time, James had commenced psychotherapy at Community Mental Health Affiliates (CMHA). (Exhibit 1; Testimony of Tammy S., Deena M., Shirley D.) After communication with the respondent father in December 2000 and January 2001, James's therapist recommended that visitation "be barred until a final decision has been made by the court system in regards to the motioned (sic) termination of [Jeffrey F.'s] parental rights. To begin visitation prematurely without purpose or intent to reunify the child with his biological father may clearly create instability in [James's] current mental status and daily functioning." (Exhibit 8; Testimony of Tammy S.) Honoring the therapist's recommendations and the court order of May 11, 2000, DCF suspended resumption of Jeffrey F.'s visitation pending resolution of the issues relating to this respondent's ability to serve as an appropriate parent for the children. (Testimony of Tammy S., Deena M., Shirley D.)
As noted above, the original TPR petition was filed by DCF on January 25, 2001, initiating the present litigation. On March 20, 2001, Nancy Randall, Psy.D. performed court-ordered psychological and interactional evaluations of Jeffrey F. and the children, along with interviews of the foster parents. Jeffrey F. cooperated with the interview aspects of Dr. Randall's evaluation process, but he unconditionally refused to perform any written or psychometric testing. Generally, Dr. Randall noted that Jeffrey F. failed to take responsibility for his own conduct, and perceived himself as "an innocent victim" of actions by DCF, Laurie V., and the DOC. (Exhibit 10; see also Testimony of Dr. Randall, Jeffrey F.)
As noted, the TPR petition against Jeffrey V. was amended on May 11, 2001, following Dr. Randall's evaluation.
1. I. C. JEFFREY F.'s CRIMINAL HISTORY
Since 1985, Jeffrey F. has been convicted of multiple crimes including Criminal Mischief Breach of Peace, Criminal Trespass and Disorderly Conduct. In addition, he has acquired repeated convictions for domestic violence-related crimes, including Assault in the third degree, Violation of Protective Orders, Violation of Conditional Discharge and Violation of Probation. (Exhibit 3.) He has been incarcerated, and thus unavailable to provide care for his children, during the following periods: December 11, 1998 through October 5, 1999, November 1 through November 3, 1999, and November 30, 1999 through November 16, 2000. On January 20, 2000, while CT Page 12707 the specific steps were pending in this matter, Jeffrey F. was convicted of Violation of Conditional Discharge and Criminal Trespass, and received a total effective sentence of eleven months in jail. (Exhibits 1, 3.)
I. D. JAMES F. AND JEANNE F., THE CHILDREN
James, who was born on December 1991, is nine-and-a-half years old. Jeanne, who was born on March 1993, is eight. These children have resided with their foster parents, Pat and Roger L. since the OTC was granted in May 1998, representing a placement of over three years. James and Jeanne call their foster parents "mom" and "dad," and refer to the foster siblings as their "sister and brother." Both James and Jeanne are very comfortable in their foster home, and Pat and Roger L. would like to adopt both children. (Exhibit 1; Testimony of Deena M., Bethany W., Roger L.) Although, early in his placement, James had mentioned his desire to return to the care of Laurie V. and Jeffrey F., he has not raised the issue of reunification with his biological parents for some time. Jeanne is quite interested in being adopted by her foster parents. (Testimony of Deena M., Roger L.)
James is affected by a number of psychological conditions including Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), and difficulties with attachment. These conditions have caused him to be physical aggressive, uncooperative and noncompliant at home and at school, and to have difficulties forming relationships with his peers or with adults. James retains specific, recurrent memories of seeing Jeffrey F. forcefully pushing his mother, Laurie V., down a flight of stairs, and throwing a wine bottle with the intent to further harm her, as well as other memories of his parents fighting with each other.[7] (Testimony of Dr. Randall, Tammy S., Bethany W.) Through the mental health care providers at CMHA, James has received medication and multi-modal psychotherapy to address his special educational and psychological needs. While he has made recent improvement in his ability to manage his own anger and to express his feelings, James's most significant progress is seen in his new ability to demonstrate attachment to and affection for his foster parents: he is even beginning to form close friendships with other children. James continues to require attentive supervision of his behavior, both through formal therapy and a well-structured, predictable and consistent environment at home, in order to maintain his gains and to continue healthy emotional development as he emerges into adolescence. (Testimony of Tammy S., Bethany W.)
Jeanne, also, has commenced psychotherapy to address increasing signs of emotional distress, which are felt to be related to the length of time attributable to these proceedings, and to her foster parents' recent adoption of a younger foster sibling. Like her brother, Jeanne has a CT Page 12708 specific recollection of seeing Jeffrey F. pushing Laurie V., down a flight of stairs, and throwing a wine bottle at her. Although she does not require medication at this time, Jeanne's successful progress is dependent upon her continued placement in a home where consistent behavior management techniques are applied, and where she is supported by a predictable environment, such as that she has found in the home of Pat and Roger L. (Testimony of Bethany W.)
 II. ADJUDICATION
As to the adjudicatory phase of these proceedings,[8] the court has considered the evidence related to circumstances and events prior to May 11, 2001, the date upon which the amended TPR petition against Jeffrey F. was filed, insofar as the allegations pertaining to abandonment, failure to achieve rehabilitation, and lack of an ongoing parent-children relationship are concerned.[9] Upon review, the court has determined that statutory grounds for termination exist as Jeffrey F., as is further discussed below, and relies upon the valid consent to termination provided by Laurie V.
II. A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that Jeffrey F. has made himself available for all court-related proceedings relating to the termination issues, and that reasonable efforts were made to locate and reunify Jeffrey F. with the children, given the circumstances presented,[10] as is required by General Statutes § 17a-112 (j)(1).[11] Also, as noted, on May 11, 2000, after hearing, the court found that further efforts at reunification would not be appropriate for the respondent father and his children. § 17a-112 (j)(1). As noted in Part II., Jeffrey F. was incarcerated for a substantial portion of the time his children have been in foster care, and he expressly refused to allow visitation with James and Jeanne during these periods. The court also notes Jeffrey F.'s failure to complete the recommended process of anger management counseling and substance abuse support, and his refusal to cooperate with the psychological testing offered by Dr. Randall. Based on the totality of the clear and convincing evidence produced at trial, the court confirms the finding of May 11, 2000, and now finds that Jeffrey F. is either unable or unwilling to benefit from reasonable reunification efforts.[12] § 17a-112 (j)(1).
II. B. STATUTORY GROUNDS FOR TERMINATION
 II. B. 1. ABANDONMENT — § 17a-112 (j)(3)(A)
CT Page 12709
As its first ground against Jeffrey F., the petitioner alleges that this respondent has abandoned James and Jeanne, within the meaning of § 17a-112 (j)(3)(A).[13] Specifically, the petitioner asserts that because Jeffrey F. voluntarily avoided contact with his children during his periods of incarceration, he has abandoned them according to the statutory standard. Jeffrey F. counters that because he was compelled to forgo visitation as the result of recommendations made by CMHA staff in early 2000, he therefore be faulted for his lack of contact with James and Jeanne. Applying the requisite legal criteria,[14] the court finds this matter in favor of the petitioner.
The evidence clearly and convincingly establishes that Jeffrey F. both voluntarily, and involuntarily, absented himself from his children's lives during his extended periods of incarceration, and further demonstrates that he failed even to attempt to serve as a parent during these periods.[15] In considering the petitioner's claims that Jeffrey F. effectively abandoned his children during these periods, the court has focused not upon the respondent's putative criminal acts, but upon his own decision to isolate himself from James and Jeanne while he was incarcerated. As noted in Part I., Jeffrey F. personally chose not to participate in visitation with his children while he was confined either as a result of pre-trial detention, or after conviction.[16] Thus, as a direct result of Jeffrey F.'s decision, his children were unable even to see him for almost one year from December 1998 through October 1999, and for another year from November 1999 through November 2000. During these extended periods, Jeffrey F. did not attempt to contact James or Jeanne, did not utilize DCF's proffered visitation services, did not call to speak with the children, and did not send them gifts, cards, letters, mementos, or any other communications that would commemorate his existence. (Exhibit 1.) The evidence does permit the inference that Jeffrey F. maintained some degree of interest in the children while he was incarcerated, notwithstanding his declared intention to deprive them of information concerning his whereabouts and the circumstances that kept him at such a remarkable distance: Jeffrey F. apparently obtained information about the children through his father, who was visiting with James and Jeanne, and then provided the respondent with news of their status. (Testimony of Jeffrey F.) However, there was no evidence from which the court could reasonably infer that Jeffrey F. used his father as a conduit for delivering fatherly communications to James and Jeanne. It is clear though, that although the family's DCF caseworker was available for this purpose, Jeffrey F. elected not to avail himself of any of the agency's services regarding maintenance of contact with the children.
Jeffrey F. has seen James and Jeanne on only two occasions since the start of his December 1998 incarceration. Due to his own choices, for practical purposes, he kept himself unavailable for visitation until CT Page 12710 November 2000, nearly two and a half years after the children had been placed in foster care. Jeffrey F. has not provided financial assistance to the children while they have been in DCF custody. He has not supplied them with the food, clothing, shelter, and medical care which is essential to their physical well-being, and he has intentionally, albeit misguidedly, withheld from them any social, moral or emotional succor he could contribute to their fragile young lives. (Exhibit 1.) Whether the adjudicatory date of January 25, 2001 or May 11, 2001 is applied, the evidence in this matter clearly and convincingly establishes that Jeffrey F. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified In re Deana E., supra, 61 Conn. App. 193.
Jeffrey F. protests that he has not abandoned his children. (Exhibit 1.) He emphasizes that he did not cause any separation from James and Jeanne that occurred from December 1998 through October 1999, as he was erroneously held in lieu of bond during that unnecessary pretrial confinement, given the jury's ultimate finding that he was "not guilty" of the domestic assault charges that were then pending against him. The question of whether Jeffrey F. was rightly detained by the criminal justice system is not within the scope of these proceedings. This court's attention is directed, instead, to the reasonable opportunities Jeffrey F. was given to maintain a relationship with his children while awaiting trial during that ten month period, and focuses upon the compelling evidence that this respondent intentionally rejected each opportunity that was provided. In re Deana E., supra, 61 Conn. App. 193. As discussed, he refused to permit DCF to bring the children to the corrections facility for visitation. Although Jeffrey F. is a high school graduate who is skilled in his technical craft, without ostensible literacy problems to impede his ability to write letters or send cards to his school-aged children, he failed to do so. He never inquired of DCF concerning the children's status, and apparently remained more concerned with his own embarrassment or anger at the fact of his incarceration than he was with keeping a close tie to James and Jeanne. Whatever the reason for his unwillingness to communicate with the children during this period, it is clear that, Jeffrey F. himself, and not the criminal justice system or the DOC, caused him to abandon his children from December 1998 through October 1999.
Jeffrey F. also contests the viability of the criminal protective order which formed the basis for arrest at Laurie V.'s residence on October 31, 1999, and which led to his second relevant period of incarceration, from November 1999 through December 2000. As discussed in Part I. B., however, the evidence clearly and convincing reflects the effectiveness of this order, which the respondent was obliged to obey both on its own terms and in deference to the specific steps which remained in effect. (Exhibits 6, 12; Testimony of Timothy V.) Moreover, this period of CT Page 12711 incarceration clearly flowed from Jeffrey F.'s criminal acts, as reflected by the fact that he received an eleven month sentence at his conviction on January 20, 2000. See Part I. C. Without regarding the circumstances of this arrest and detention, in considering the TPR ground of abandonment, the court must focus upon Jeffrey F.'s conduct during the ensuing year of incarceration: as noted in Part I. B. and as discussed above, Jeffrey F. unilaterally determined that he would not allow his children to visit with him while he was imprisoned and severed all direct contact with James, Jeanne and their foster parents during this period. Again, the choice of this respondent, and not the actions of third parties, led to his failure to visit, to display love or affection for the children, to personally interact with them, or to demonstrate concern for the children's welfare. Such conduct on the part of a biological parent constitutes statutory abandonment. See In re Deana E., supra,61 Conn. App. 193.
As discussed in Part I. B., although Jeffrey F. requested recommencement of visitation after his discharge from the DOC in November of 2000, DCF did not permit him to meet with his children, reasonably relying upon the recommendations of James's therapist at CMHA. Jeffrey's demonstration of interest in contacting the children occurred only when he was at liberty, a situation which occurred only sporadically during the first two and a half years when these children were placed in foster care.[17] Such sporadic showing of interest and concern for the children does not meet the criteria of appropriate parenting conduct, contemplated by § 17a-112 (j)(3)(A). See In re Deana E., supra,61 Conn. App. 193.
Based on the findings recorded in Part I. and reviewed above, the clear and convincing evidence in this matter reveals that Jeffrey F. has abandoned James and Jeanne, within the meaning of § 17a-112 (j)(3) (A). See In re Deana E., supra, 61 Conn. App. 193; In re Kezia M.,
supra, 33 Conn. App. 17-18. Accordingly, the petitioner has met her burden of proving the first ground of the TPR petition pending against this respondent.
II. B. 2. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (j)(3)(B)(i)
The petitioner alleges that the statutory ground of parental failure to rehabilitate supports the application for termination of Jeffrey F.'s parental rights to James and Jeanne pursuant to § 17a-112 (j)(3) (B).[18] Specifically, the petitioner asserts that Jeffrey F. has failed to sufficiently develop the ability to control his anger or his violent behavior in domestic situations, to demonstrate valid parenting skills, to understand his drug and alcohol abuse problems, and to conform CT Page 12712 his conduct to the laws of this state, and that he therefore cannot serve as a responsible parent for these children. Jeffrey F. counters that he has attended to the pivotal elements of his specific steps, and that he has made progress in rehabilitation to resume a responsible role in the lives of these children. Applying the requisite legal standards,[19]
the court finds this issue in favor of the petitioner.
Jeffrey F.'s rehabilitation needs were identified for the court in November 1998, when the specific steps were issued to designate the counseling and services he required.[20] (Exhibit 12.) Notwithstanding these steps, as discussed in Part I., Jeffrey F. only partially cooperated with the rehabilitative services directed at his problems with substance abuse, anger management, and propensity for violence against his family members. As discussed in Part I., over the past two and a half years when the steps have been in effect, Jeffrey F. has not completed his substance abuse treatment: he attended a number of Genesis sessions, but failed to follow through by attending AA or any other substance abuse support and relapse prevention group as recommended by the provider. He did not complete the course of anger management therapy, having attended only a few sessions with his counselor, Richard M., Jeffrey F. has never completed any course of individual counseling directed at developing insight into his personal problems; he has not completed an adequate parenting education program, notwithstanding multiple referrals; he has not fulfilled his obligation to complete domestic violence counseling, insisting that he has no need for such services;[21] and he continued to violate the laws of this state, notwithstanding the specific steps which prohibited such activity as the violation of the criminal protective order in effect in October 1999.
The clear and convincing evidence supports the court's conclusion that Jeffrey F. has failed to achieve a level of rehabilitation which would reasonably encourage the belief that at some future date he can assume the role of the primary caretaker for James and Jeanne. In re Sarah AnnK., supra, 57 Conn. App. 448. Having failed to comply with the recommendations for rehabilitation, Jeffrey F. maintains a high degree of anger and remains unwilling to accept any responsibility for his role in the problems that have befallen his family, unrealistically insisting that others are to blame for his predicament.[22] He still lacks insight into his history of domestic violence or its effect upon his children, or any aspects of his own issues or his children's special emotional and psychological needs. (See Exhibit 10.) These retained characteristics of Jeffrey's personality and psychological profile are essentially the same as those he presented to DCF at the time of the family's referral in 1997, and were precisely the conditions which the court sought to remedy through issuance of the specific steps in 1998. CT Page 12713
Jeffrey F. demonstrates a pattern of inability or unwillingness to cooperate with those who have tried to assist him in dealing with the factors which prevent him from serving as an appropriate parent: this aspect of his conduct fundamentally interfered with his rehabilitation process. His lack of cooperation with authority figures is manifest in his absolute refusal to follow Dr. Randall's request that he participate in certain aspects of the testing performed in March 2001, and his insistence that it was more important for him to use the scheduled time to visit with his daughter, than to comply with court orders. (See also Exhibit 10.) Jeffrey F.'s unwillingness to participate in the aftercare support groups recommended by Genesis, or to follow through with Richard M.'s anger management counseling, support the conclusion that this respondent possesses a contrary personality, which is incompatible with appropriate functioning as a parent. Jeffrey F.'s failure to obtain alternative personal counseling demonstrates not only his non-compliance with the court's specific steps but also his continuing practice of scoffing at recommendations which are clearly designed to help him.[23]
All of this behavior is fully consistent with Jeffrey F.'s criminal history which establishes a pattern of non-compliance with orders issued by the criminal courts in relation to matters of probation, conditional discharge, or written protective orders.
Perhaps most disheartening is the fact that, despite the long period that has transpired since his children were committed to DCF, Jeffrey F. has not developed even the most rudimentary appreciation of the devastating effects domestic violence can cause to young children who witness such events.[24] More than two years after James and Jeanne had been placed in foster care, Jeffrey F. explained to Dr. Randall that "he did not know how his children reacted to the arguing and fighting" to which they were exposed when they lived with their biological parents. (Exhibit 10). Although Jeffrey F. admitted to this psychologist that "his alcohol use may have played some part in the problems" that developed between Laurie V. and himself, he has never completed a substance-abuse program which provides long-term support for alcohol abusers, and thus lacks an understanding of the events and circumstances that can trigger domestic violence. (Exhibit 10.) It is evident that Jeffrey F. has rejected the need to attend counseling or to receive services in compliance with the court's specific steps because "[he] does not believe he is in need of any treatment at this time." (Exhibit 10.) The court accepts the credible testimony of Dr. Randall,[25] supported by the other evidence, and concludes that notwithstanding the services offered to him, Jeffrey F. has made no improvement at all in his ability to serve as a responsible parent for his children. (Testimony of Dr. Randall.)
The court's application of § 17a-112 (j)(B) requires an analysis of the time when it is foreseeable that Jeffrey will have achieved the CT Page 12714 ability to serve as an effective caretaker for James and Jeanne. The clear and convincing evidence in this case supports the conclusion that he will not achieve this status in the foreseeable future. Jeffrey F. remains unreasonably interested in himself, and is unable to focus upon what his children require in order to maintain their fragile emotional stability. (Testimony of Dr. Randall.) In the words of Dr. Randall, even after the passage of a significant amount of time since the commencement of DCF's involvement with the family, Jeffrey F. remains "an angry, defensive man who does not take responsibility for his own actions. . . . He believes that people are simply out to get him and that he needs to outwit them before they can succeed. He shows no recognition at all that the professionals working with his family may actually have his children's best interests at heart. . . . [i]t is unlikely that he would be willing to work cooperatively with DCF or other professionals if the children were returned to his care." (Exhibit 10.)
The clear and convincing evidence indicates that any rehabilitation Jeffrey F. may have achieved falls far short of that which would reasonably encourage a belief that at some reasonable date in the future, he will have sufficiently improved his control over his anger and violent impulses, or gained a workable understanding of the complex behavioral and emotional conditions that affect his school-age children, and serve as their caretaker. See In re Sarah Ann K., supra,57 Conn. App. 448; In re Ashley S., supra, 61 Conn. App. 665. In its totality, the clear and convincing evidence compels the conclusion that Jeffrey F. remains without the qualities necessary to successfully parent James and Jeanne, and that he lacks the ability to assume a responsible position in their lives within a reasonable time. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved Jeffrey F.'s failure to achieve rehabilitation pursuant to § 17a-112
(j)(3)(B).
 II. B. 3. LACK OF ONGOING PARENT — CHILDREN RELATIONSHIP — § 17a-112 (j)(3)(D)
The petitioner next alleges that because no ongoing parent-child relationship exists between Jeffrey F. and either of his two children, this respondent's parental rights should be terminated pursuant to General Statutes § 17a-112 (j)(3)(D).[26] Specifically, the petitioner asserts that Jeffrey F.'s parental status was displaced as the result of his long-term absence from the children's lives. Jeffrey F. counters that because both children retain memories of him, he effectively maintains an ongoing parent-child relationship with them. Applying the requisite legal standards,[27] the court finds this matter in favor of the petitioner. CT Page 12715
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Jeffrey F. and either James or Jeanne. In re Jonathon G., supra, 63 Conn. App. 525. In so doing, the court acknowledges the findings made in Part II. B. 1., establishing that Jeffrey F. intentionally kept himself sequestered from his children during his long periods of incarceration, failed to provide for their physical or financial necessities, and has not met, in any valid respect, their emotional, moral or educational needs for an extended period of time. Furthermore, the court notes that during Dr. Randall's March 2001 interactional evaluation, the children showed only a weak relationship with Jeffrey F. Although both James and Jeanne answered Jeffrey F.'s inquiry by stating that they wanted to go home with him, this response was presented without sincerity, or evidence of a clear bond to the respondent. The court credits Dr. Randall's cogent opinion that such comment was made so the children could avoid appearing disloyal to their biological father, not because they attached any emotion or commitment to their words.[28] (Exhibit 10; Testimony of Dr. Randall.)
In discerning the existence of a parent-children relationship, the court must also determine whether James and Jeanne maintain any present feelings for Jeffrey F. and, if so, whether those feelings are of a positive nature. In re Jonathon G., supra, 63 Conn. App. 525. As discussed in Part I. D., both of these children retain vivid negative memories of Jeffrey F.: their only positive recollection relates to a visit at a child-oriented restaurant.[29] Their most indelible memories are of an extremely painful nature, relating to the domestic violence they witnessed when Jeffrey F. assaulted their biological mother, throwing her down the stairs and attempting to strike her with a wine bottle. Such memories are not positive, and are inconsistent with an appropriate parent-children relationship. The court recognizes that James respects his parental surname, and maintains a sense of affiliation with Jeffrey F. However, even this pre-adolescent child recognizes that Jeffrey F.'s offensive behaviors and personal problems render him an inappropriate person with whom to maintain a parental relationship.(Testimony of Bethany W.)
As it is thus apparent that no parent-children relationship here exists, the court is next called upon to assess whether it would be detrimental to the childrens' best interests to allow additional time for a parenting relationship to be developed with Jeffrey F. In re JonathonG., supra, 63 Conn. App. 525. As discussed in Part II. B. 2., Jeffrey F. does not possess the interest, skills, or commitment necessary to serve as the caregiver for James or Jeanne. He has developed no clear understanding of their complex emotional states, has not satisfactorily studied parenting matters in general, and apparently has made no attempt to educate himself about appropriate methods of nurturing and managing CT Page 12716 the children's behavioral and mental health issues. On the other hand, James and Jeanne are now in a stable residence where they have the benefit of a violence-free environment; where their foster parents are actively engaged in the process of attending to their educational, psychological, and social issues; and where their need for. a predictable and consistent lifestyle is met by adults who are always present and not absent for long periods of time. Under these circumstances, and adopting the discussion and findings set forth Part II. B. 2., it is clear that the children's best interests cannot be served by allowing more time to pass before the permanency of their placement is resolved.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). Such construction of §17a-112 (j)(3)(D) is applicable to the present case, where the clear and convincing evidence establishes that any valid relationship that James and Jeanne may have developed with Jeffrey F. in the past has been definitively lost, due to his self-ordained absence, involvement in domestic violence and inattention to the children's needs. As the clear and convincing evidence in this case establishes that no ongoing parent-children relationship exists between Jeffrey F. and James and Jeanne, and that it is not in the best interests of these children to allow more time for them to develop a relationship with their biological father, the petitioner has met her burden of proof under § 17a-112
(j)(3)(D). In re Jonathon C., supra, 63 Conn. App. 525; In re John G.,
supra, 56 Conn. App. 22.
 III. DISPOSITION
As to the dispositional phase of this hearing,[30] the court has considered the evidence and testimony related to circumstances and events up to and including the date upon which the evidence in this matter was concluded?[31]
III. A. SEVEN STATUTORY FINDINGS
With respect to the seven written factual findings required by General Statutes § 17a-112 (k), the court has made each of the following findings based upon the clear and convincing evidence produced at trial. The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[32] Pursuant to § 17a-112 (k), such CT Page 12717 findings are only required as to Jeffrey F. in light of Laurie V.'s valid consent to TPR.
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — §17a-112 (k)(1)
As noted in Parts I. A. and B., Jeffrey F. received referrals for substance abuse evaluation and treatment in 1997 but he refused to attend. He was later given referrals to ABH, Genesis Center and community support groups for substance abuse issues; to Richard M. at Interface Counseling for individual anger management counseling; to parenting education providers; and to KidSafe for visitation. Due to his recurrent incarceration, other service providers were not designated. On May 11, 2000, the court found that further reunification efforts or services were inappropriate. As indicated in Part II. A., this court has determined that Jeffrey F. is unwilling or unable to benefit from further reunification services.
 III. A. 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112 (k)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. See also Part III. A. 1.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
As discussed in Part II. B. 2., Jeffrey F. failed to comply, in large part, with the specific steps issued by the court on November 25, 1998. He further failed to adequately cooperate with the court-ordered psychological evaluation attempted by Dr. Randall. See also Part I. B.
III. A. 4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — § 17a-112 (k)(4)
James and Jeanne are firmly attached to their foster parents. They have no strong relationships with either of their biological parents, and are clearly more comfortable with their foster parents than with their father. (Exhibit 10.)
The court finds that while both children maintain memories of Jeffrey F. as their father, those memories are primarily of a negative nature and consistent with those found in children who have witnessed severe domestic violence. (Testimony of Tammy S.) Both James and Jeanne maintain a connection to Jeffrey F. that is in the nature of a biological allegiance, rather than a bond founded upon positive experience.[33]
CT Page 12718 (Testimony of Dr. Randall, Bethany W.) James fully recognizes that his father is not able to take care of him, and that his foster parents are fulfilling that responsibility very well. (Testimony of Bethany W.) See also discussion in Part II. B. 3.
III. A. 5. AGES OF THE CHILDREN — § 17a-112 (k)(5)
James will be ten on December 1991. Jeanne turned eight on March 1993.
III. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES —§ 17a-112 (j)(6)
Jeffrey F. has not maintained adequate contact with James and Jeanne, nor with the foster parents or DCF regarding the status of these children. At his own election, he suspended visitation, and voluntarily withdrew from contact with the children, during his periods of incarceration. By continuing his criminal activity, including violating the protective order that had been issued at the conclusion of his criminal court proceedings in October 1999, and by his desultory response to rehabilitation efforts, it is clear that Jeffrey F. has not made realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the children to be reunited with him.
 III. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112 (j)(7)
The court finds that no unreasonable conduct by the child protection agency, foster parents or third parties prevented Jeffrey F. from maintaining relationships with the children at issue.
III. B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (j)(2)
The court is next called upon to decide whether termination of the parental rights of Jeffrey F. and Laurie V. would be in the best interests of James and Jeanne.[34] Applying the appropriate legal standards[35]
to the facts which are clearly and convincingly apparent in this case, the court finds that termination of these parental interests will best serve the children at issue.
In considering whether termination of the parental rights of Jeffrey F. and Laurie V. would be in the best interests of James and Jeanne, the court examined multiple relevant factors including the children's need for sustained health, stability and continuity of their environment; CT Page 12719 their length of their stay in foster care; the nature of their relationship with their foster parents; the nature of their relationship and genetic bond with their biological parents, and the degree of contact maintained with them. In re Savanna M., 55 Conn. App. 807, 816,740 A.2d 484 (1999) (genetic bond between biological parent and his or her child, although not determinative of the issue of the best interests, should be considered). See also In re Alexander C., supra,60 Conn. App. 559; In re Shyina B., supra, 58 Conn. App. 167. In a matter such as this, the court must therefore balance the children's intrinsic needs for stability and permanency against the maintenance of a connection with their biological parents. Pamela B. v. Ment, 244 Conn. 296,313-314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Applying the requisite standards to the circumstances presented in this matter, the clear and convincing evidence in this matter establishes that it is not in the children's best interests to continue to maintain any legal relationship with their biological parents. Clear and convincing evidence establishes that Pat and Roger L. possess the commitment, determination, and skill to provide the consistently structured home environment, and predictable, safe lifestyle which these children need. The foster parents have regularly attended counseling sessions and support groups, and have demonstrated their willingness to learn and patiently follow the medication regimens and to apply the behavioral management techniques that provide such benefit for both children. James, particularly, receives in his foster home the reliable, orderly type of parenting he requires in order to learn to trust adult authority figures. Fortunately, these foster parents would like to adopt the children, if they become available. (Exhibit I; Testimony of Bethany W., Roger L.)
Given Jeffrey F.'s lack of rehabilitation, his persistent scoffing at his need for services, and his lack of insight into his own problems or the issues facing his children, it is obvious that James and Jeanne could not be expected to achieve stability, security or consistent care and support if their biological father was allowed to serve as their primary caretaker. Pamela B. v. Ment, supra, 244 Conn. 314. Although Jeffrey F. protests that he loves James and Jeanne, he also states that he has never hurt them, indicating his lamentable inability or unwillingness to appreciate the significant, long-lasting harmful effect caused to these children by their father's role in the multiple incidents of domestic violence at their home. Jeffrey F. has not returned to personal counseling, and has presented no for the court to consider insofar as continuing the psychological counseling and behavioral management that is necessary for his children's wellbeing, should the court not terminate his parental rights. Instead, he has declared that he would likely, CT Page 12720 "`leave the state once he had the children back in his care'" without providing the consistent, reliable and predictable environment and support services the children require. (Exhibit 10.) In sum, the totality of the evidence presented in this case supports the conclusion that Jeffrey F. is either unwilling or unable to understand or care for James's special psychological needs or Jeanne's emergent mental health issues, that he has no realistic or informed care plan for the children, and that their best interests cannot be served by continuing his parental role.
As to Laurie V., the evidence reflects that this respondent has not maintained contact with DCF or the children since May 2000, although she has, from time to time, participated in substance abuse rehabilitation therapy. (Exhibit 1.) The court acknowledges that, in addition to voluntarily ceding her parental rights, Laurie V. has not contested the continued placement of James and Jeanne with their current foster family, tacitly conceding that such placement is in the children's best interests. As recognized by the children's counsel, Laurie V. has acted in a mature, responsible and sensitive manner by consenting to termination of her parental rights. This act of comity illustrates the love she sincerely feels for her children, notwithstanding the personal problems that prevent her from serving as a responsible parent for James and Jeanne.
The parenting methods used by Pat and Roger L. are thus the antithesis of those to which James and Jeanne were exposed when Jeffrey F. and Laurie V. served as their parents. As the result of consistent and appropriate parenting he has received in foster care, and as a result of his freedom from unpredictable violence in his home, James developed confidence and maturity, manifest through his maintenance of excellent grades in school and an emerging affinity for activities involving other children, including team sports and friendships. Jeanne, as well, has flourished in her current foster home, doing well in school and displaying a bouyant, upbeat personality which is somewhat diminished when she considers the prolonged nature of this litigation. The children have the benefit of bi-weekly visits with their paternal grandfather, and their foster parents have worked effectively to maintain close relationships with both their maternal and paternal families.[36]
(Exhibit 2.; Testimony of Roger L.) Simply put, the evidence clearly and convincing reflects that James and Jeanne are both adored and well managed, by their foster parents. (Testimony of Roger L.)
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or CT Page 12721 temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). The children's GAL has found termination of parental rights to be in the best interests of these children, and the children's attorney has vigorously argued that such result should be effectuated now, without further delay. The GAL and the children's attorney have both stated that only termination will permit the continuing beneficial effect of their quasi-therapeutic placement with loving, reliable parent-figures. Dr. Randall, the evaluating psychologist, clearly opined that "[i]t would be most appropriate to allow the children to remain in [their foster] home on a permanent basis." (Exhibit 10.) The court received absolutely no evidence to establish the unreasonableness of this request. The court is constrained to agree with the children's attorney, their GAL, and the psychologist. Having balanced James's and Jeanne's intrinsic need for stability and permanency against the benefits of maintaining a connection with their biological parents, the clear and convincing evidence in this case establishes that these children are entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation. Pamela B. v. Ment, supra, 244 Conn. 313-314.
Accordingly, by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Jeffrey F. and Laurie V. is in the best interests of James F. and Jeanne F., as contemplated by § 17a-112 (j)(2).
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for a secure and permanent environment, their relationship with their biological and foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the children's best interest, the court issues the following ORDERS:
That the parental rights of Jeffrey F. and Laurie V. are hereby terminated as to the children James F. and Jeanne F.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for James F. and Jeanne F. for the purpose of securing an adoptive family or other permanent placement for them.
That a permanency plan shall be submitted within 30 days of this CT Page 12722 judgment. That the Commissioner is hereby directed to give primary opportunities for adoption to the foster family with whom the children are currently placed, and is further directed to use all means possible to ensure that the children remain placed together.
BY THE COURT, N. Rubinow, J.